Bergan, J.
This action was commenced in 1961 by the 10 major railroads operating in New York seeking a judgment declaring invalid on constitutional grounds the full crew laws then in effect (Railroad Law, §§ 54-a, 54-b and 54-c) and enjoining their enforcement. In a trial at Special Term commencing in October, 1964, there was a comprehensive factual examination into the reasonableness of the effect of the full crew laws on the operation of plaintiffs ’ railroads under modern technological conditions and operational procedures.
The trial occupied almost four months; 110 witnesses were heard and there were, in addition, tens of thousands of pages of exhibits reeéived in evidence. The court in a careful opinion (46 Misc 2d 68) directed the complaint be dismissed and judgment accordingly was entered in April, 1965.
While the appeal taken by plaintiffs to the Appellate Division in May, 1965 was pending, the Legislature repealed two of the three full crew statutes (§§ 54-a and 54-c) and this was approved by the Governor on June 27, 1966. The Legislature refused to repeal section 54-b, although the Public Service Commission, one of the defendants in the action, had suggested the repeal of all the statutory full crew provisions.
Accordingly, when the appeal was argued at the Appellate Division, the only remaining issue was the validity of section 54-b. The Appellate Division affirmed the findings of the Special Term but, modifying on a procedural point explicitly to declare section 54-b constitutional, otherwise affirmed on the opinion at Special Term.
Although two of the three sections encompassing the full crew policy of the State, as challenged in this action, have now been repealed, it seems useful to examine their relationship with section 54-b to help understand the purpose of a manifestly deliberate legislative determination to continue in effect that section. The Assembly rejected by a vote of 120 to 20 an amendment to include section 54-b in the repeal. This decision was made against the argument both of the railroads and the conclusions of some other agencies that conforming with its requirements serves no useful public purpose under present-day operational procedures.
Section 54-a was the original full crew law. It was enacted in 1913 (L. 1913, ch. 146; amd. L. 1921, ch. 290) and provided *7 among other things that a freight train of more than 25 cars be ‘ ‘ manned with a crew of not less than one engineer, one fireman, one conductor and three brakemen ”. Section 54-c, enacted in 1937 (L. 1937, ch. 903), provided in switching or transfer operations trains be operated with a crew of “ not less than one engineer, one fireman or helper, one conductor or foreman and two trainmen or two helpers ”.
Section 54-b, the statute now in issue, was enacted in 1936 (L. 1936, ch. 777) and is addressed to the then growing use of diesel engines to replace steam engines. It provides that every diesel engine (“ fuel-electric engine ”) must be “ manned with a crew ’ ’ of not less than ‘ ‘ one engineer and one fireman or helper ”.
Plaintiffs do not argue that the engineer should be alone in the diesel engine of either a passenger or freight train. They concede there ought to be an additional man there as a helper and admit to be valid the general thrust of the statute requiring this. But they say that their operational rules and uniform practice in present-day, over-the-road freight operation is to place a qualified helper, a “ front-end brakeman ” in the engine.
This, plaintiffs suggest, adequately meets the statutory requirement for the presence of a “ fireman or helper ’ ’ in freight operations, since the term “ fireman ” derived from the laws relating to steam engines (e.g., former § 54-a) had no literal application to diesel engines.
Consistently with this argument they concede that in passenger trains where the front-end brakeman does not ride in the engine cab, there must be a helper specially assigned for the engineer and that in this effect on passenger train operation the statute is valid.
In order to come to grips with the suggestion of plaintiffs that the statute is unconstitutional, it is necessary preliminarily to decide two things: (a) whether section 54-b must be read as requiring the assignment of an additional engine crewman to help the engineer, and that this is not sufficiently met by the assignment of a front-end brakeman from the train crew; (b) if the statute is construed to require the helper to be a member of an engine crew, whether the requirement is rationally based in the promotion of safety. The opinion of the Special Term must be read as finding affirmatively on both aspects; and, if *8 this is right, the statute is unexceptionable on constitutional grounds.
Some help in deducing what the Legislature intended in 1936 by the expression ‘ ‘ and one fireman or helper ’ ’ is obtainable both by reading section 54-a as it then existed and by reading the closely contemporaneous enactment in 1937 of section 54-c. The older section (54-a), in effect in 1936 when 54-b was enacted and addressed to steam operations, used the expression as to freight trains of more than 25 cars: ‘[1] one engineer, one fireman, one conductor and three brakemen ”.
It was easy to draft this because the positions had well-recognized names developed in railroad usage over many years. It was obvious and inherent in the very names used that the crew on the steam engine consists of engineer and fireman, jobs only related to the engine; and the other places of conductor and brakeman are only related to the train.
But, of course, a “ fireman ” on a diesel engine is a misnomer. There is no fire and no use for a “ fire ” man. Diesel engines in 1936 seemingly had not had time to develop a special identifying name for an engine crew member additional to the engineer and have not yet done so. If the purpose was to require an additional man on the engine, the safe approach for the draftsman was to use a term which, although not technically and exactly consistent with diesel operations, had come, by long usage in union, management, and operational relations in railroads, to be well understood and the subject of statutes, regulations and contracts.
Thus, a careful draftsman might use ‘ ‘ fireman ’ ’ but would give free scope to the statute by adding ‘ ‘ or helper ’ When that was written in 1936, of course, it had to be read with 54-a as to the rest of the operational crew. Thus, read together after the 1936 enactment and when related to a long freight train pulled by diesel power, the total crew would be ‘ ‘ one engineer and one fireman or helper ” and also be “ one conductor and three brakemen ”. This language suggests as to the train crew the continuance of a separate entity from the engine crew and the same kind of distinction between the two which had resulted from the earlier differences in the 1913 statute expressed in well-understood job terms.
*9 The 1937 enactment of section 54-c is not conclusive on what the Legislature had in mind in 1936, but it is closely enough related in time and subject matter to throw some light on the legislative belief or disbelief that the crews were being kept intact and separate in the legislative scheme. And it indicates rather reliably what the Legislature meant by “ or helper ’ ’ the year before.
The 1937 statute, as it has been seen, dealt with switching or transfer operations. It described all the crew required in such operations and it affected steam locomotives and diesel engines alike. There must be “ one engineer, one fireman or helper, one conductor or foreman, and two trainmen or two helpers ”. It is difficult to read this in a sense other than to mean that the “ or helper ” following “ fireman ” related to a specially assigned engine assistant; and the “ or helpers ” following the plural “ two trainmen ” related to the train crew. It is reasonable to think that, as used in 1936 in 54-b, the term ‘ ‘ one fireman or helper ’ ’ did not envisage and would not be satisfied by, the presence in the engine of one of the brakemen who were separately required to be provided for the train.
This is the way the court at Special Term read section 54-b. The opinion noted the words “ fireman or helper ” were “ used to designate the second man in the engine crew * * *. The statutes do not specify what those duties are but in the absence thereof the requirement could only have been intended to mean such duties as were generally associated with the position of fireman, or helper, as the second man in the engine crew was sometimes referred to on locomotives such as the diesel-electric, on which the work of firing the boiler was not required to be performed.” (Nolan, J., 46 Misc 2d 68, 84.) The court underpinned this construction of the statute on inferences derived from the massive record on which the judgment was based.
Indeed, this is the sense in which plaintiffs themselves pleaded the statute was commonly construed by public authority. The complaint alleged, as part of the factual basis to establish unconstitutionality, that the “ effect of said laws ” was to “ compel plaintiffs to employ unnecessary firemen ”. Plaintiffs argue in this court that the statute should be construed to permit the assignment of a brakeman to the engine. Addressing *10 themselves to the conclusion of the Special Term that the statute requires the presence of a fireman or his equivalent in an engine crew, plaintiffs say the “ statutory rule ” that ‘ ‘ the fireman must be in the cab and have the qualifications of an engineer comes from the trial court, not the Legislature. * * * There is no basis for the trial court’s defining the undefined term ‘ helper ’ to require a person having ‘ the training and qualifications ordinarily possessed by firemen’ in the cab of the locomotive and to exclude all other members of a three- or four-man crew who are equally available and qualified to help the engineer.”
But the main thrust of plaintiffs’ constitutional argument, and, indeed, the basic allegation of the complaint, is that plaintiffs are placed by section 54-b under just such a compulsion. The argument thus made requires this court, as it did the court at Special Term, to construe the statute.
In 1959 the Legislature by concurrent resolution of both houses directed the Public Service Commission to investigate the operation of the full crew statutes, including their relationship to the safety of railroads, and to report its findings and recommendations to the Governor and the Legislature (Concurrent Resolution 134, approved March 25, 1959).
The commission in its report (Jan. 26, 1960) recommended the repeal of all three sections. It has been seen that six years later the Legislature followed this recommendation in part and rejected it in part. But it is significant on the construction to be given section 54-b that the Public Service Commission in its extensive examination into the full crew laws construed that section exactly as the Special Term construed it in this action — that the Legislature intended to require a fireman or the engine-crew equivalent of a fireman in the diesel engine.
The report of the commission stated: ‘ ‘ Although the 1936 enactment, adding Section 54-b to the Railroad Law, prescribed a minimum ‘ full crew ’ (not less than one engineer and one fireman) for all fuel-electric engines, its objective appears to have been to insure the future employment of a fireman on diesel-electric locomotives, the use of which in place of steam locomotives had then commenced upon a minor scale in this State ” (Report, N. Y. Legis. Doc., 1960, No. 2, p. 6).
*11 A few paragraphs later the report continued (id., pp. 8-9): “ [A]lthough the laws in question literally prescribed minimum ‘ full crews ’ for * * * engines * * * they were intended and designed mainly to insure the employment of * * * a fireman on diesel locomotives replacing steam locomotives”. The commission added that “ the full crew laws constitute rigid, inflexible requirements of statewide application regardless of the widely-varying conditions and circumstances under which railroad operations are conducted ” (id., p. 9).
There cannot be the slightest doubt that this regulatory commission, knowledgable in railroad problems and with the history and development of statutes and public regulations affecting railroads in mind, construed section 54-b as mandating the assignment of a type of ‘ ‘ fireman ’ ’ in diesel engines, a mandate which would not be satisfied by the presence of a brakeman. Although the plaintiffs argue, as it has been noted, that the statute is, by its terms and reasonable intent, met by the assignment of a brakeman to the engine, the construction given the statute by Special Term seems the right reading of its language.
If it be held that section 54-b requires an engine crewman fireman-type assistant to the engineer, the question then is whether it is a constitutionally valid requirement. If it serves some rational purpose to promote safety it would lie within the competence of the Legislature; if it be a hollow device to shelter locomotive firemen from the economic consequences of diesel engine technology and of no useful purpose in the operation of the equipment, the railroads ought not be compelled to conform to it.
Its effect may not be quite as expensive as the railroads say it is. Defendants and intervenors argue that the railroads ’ cost claims are not factually supported and are too high; but no one could deny that if the statute is enforced, as now construed, it adds substantial costs to freight operations.
Were its only effect what the Public Service Commission regarded as its main purpose — to ‘[1] insure the employment” of a “fireman on diesel locomotives replacing steam locomotives”— the validity of the statute would be open to doubt. But there is a difference between purpose and effect and the commission did not suggest job making was the only effect or, *12 for that matter, only purpose of the statute. It used the adverb “mainly” as to purpose; nor is the commission’s view on the reason for the 1936 statute necessarily the right one. Governor Lehman’s memorandum of approval stated its purpose was “to protect human life” (Public Papers of Governor Lehman, p. 494).
As Governor Rockefeller noted when he signed the statute repealing 54-a and 54-c, the amendment leaves “ in effect only the requirement * * * for an engineer and a fireman or helper on every fuel electric engine ’ ’. The bills then being approved, he added, were ‘[1] developed through intensive negotiations among my staff and representatives of the Railroad Brotherhoods and the railroads ’ ’. It seems reasonable to think that a legislative compromise between economic interests underlay the deliberate decision to continue section 54-b.
Both in their pleading and in their argument here plaintiffs place reliance on the Report of the Public Service Commission to the Governor and Legislature recommending repeal of all the full crew laws. They argue: “ The trial court’s finding that a reasonable legislative purpose still exists for requiring firemen on all freight and yard locomotives throughout the entire State of New York conflicts with the conclusions of all tribunals which have passed upon the question”. Among these is the commission.
The Special Term and the commission were, of course, addressing themselves to rather different problems. The commission was reporting on the policy question—whether the legislation should be repealed; the court was deciding the question whether it was constitutional.
When the report of the commission is read closely it will be observed that, although it said a good many things, it did not say that firemen or their engine crew equivalents should not be required by the State to serve on diesel engines in freight service. The main criticism of the statute by the commission was its inflexibility, i.e., “ these fundamental faults and weaknesses of rigid, inflexible minimum crew requirements having general application” (Report, op. cit., p. 54).
The commission recommended that if the Legislature gave it the power to regulate the composition of train crews it would work out better than any statutory prescription. Rather than *13 do this by a statute, the commission felt that the ‘ ‘ judgment of railroad management ” should be subjected “ to the supervening regulatory control of an agency such as this Commission ” and that railroad management should not ‘ ‘ be left completely free [of State control] to exercise its own judgment ” (id., p. 56). The commission proposed that it could do this, better than a general statute, by ‘ ‘ rule, regulation or order ’ ’.
But such devices, when they get to be promulgated by regulatory commissions, look and operate very much like general statutes. The commission can get closer to operations than the Legislature and thus seem to afford flexibility, but it cannot make a rule for each train as it goes out and if it dealt with the subject of who besides the engineer should be in the engine, it could not escape doing so by some generalization.
The commission was reticent about just what kind of a “ rule, regulation or order ” it might deem a desirable substitute for the rigidity of the statute. It said: ‘ ‘ For the same reasons which prompt us to condemn general statutory enactments on the subjects, we feel that it would be most improper for us to make any general findings in this report upon these controverted questions. * * * Likewise, we feel that it would be equally improper for us to endeavor to specify in this report any prospective or potential rule, regulation or order we might adopt governing minimum crews, since if the full crew laws are repealed, as we advocate, any such rule, regulation or order would have to be promulgated under the procedures provided for in subdivision 2 of Section 49 of the Public Service Law, i.e., based upon findings supported by substantial evidence pertaining to the situation or situations involved ” (id., p. 57).
Thus, the commission felt the statute was too rigid; that it could itself perform the regulatory function with more flexibility; but it declined to tell the Legislature how the specific merits of any of the particular objections the railroads were asserting should be dealt with. Nor does its report and recommendations afford much guidance to a court seeking an answer to the question of constitutionality.
Therefore, the plaintiffs’ reliance in their complaint on the rationale of the commission, noting the lack of relationship between the ‘ ‘ statutory full crew requirements ’ ’ and‘‘ safety ’ ’, must be seen in the context of the recommendation in the *14 report that commission rules would work better than the statute, and this neither supports the declaration and injunction sought nor is it helpful to a court in reaching the constitutional issue.
A very large part of the formidable record developed at Special Term was concerned with this question of the relationship between a requirement to have an engine crew helper with the engineer and safety of operation. The problem, as the court posed it, was whether this requirement was unreasonable in 1936, “ and if not, whether that requirement is unreasonable under present conditions, or at least whether the question of reasonableness is fairly debatable so as to preclude its determination by the courts ” (46 Misc 2d, p. 84).
The court then made a series of statements which are to be read as factual findings or conclusions drawn from the record, dealing with technological improvements in the operation of freight trains and the continuing need, notwithstanding these improvements, of the fireman or helper in the engine (see 46 Misc 2d, pp. 84-87).
Drawing this factual analysis together, the court noted that the evidence established, and it was found, that in road freight service, particularly in switching operations, ‘ ‘ the head brakeman on frequent occasions is not in the cab of the locomotive, and the fireman is the only crew member in position to take and pass signals and to act as lookout on the left-hand side. Moreover, in all types of service, he is the only employee in the cab who may be expected to be capable of relieving the engineer in case of fatigue or emergency.” (Id., p. 87.)
From this, the corollary finding was made, drawn in negative terms, that the ‘ ‘ evidence does not establish ’ ’ that ‘ ‘ the lookout and signal-passing duties of the firemen in road freight service are unsubstantial or that they can be dispensed with without some sacrifice of safety” (id., p. 87). The conclusion from all this was: ‘ ‘ Although there is room for argument, and the question may be fairly debatable, I do not find that it is unreasonable to require, as the full crew statutes do, that a second man be present in the locomotive cab, or that the second man shall have, in addition to ability to act as lookout and read and pass signals, the training and qualifications ordinarily possessed by firemen, which may make it possible for him to be of *15 assistance to the engineer in the operation of the locomotive ” (id., pp. 87-88).
Plaintiffs argue that these factual conclusions drawn at Special Term are not supported and that on an impressive mass of data, reports, opinions and operational experience, the inference ought to have been made that section 54-b, as construed by the court, adds nothing to the safety of the railroads. Much of this is an argument for different fact-finding.
The respondents and interveners argue not only that the conclusions, of the Special Term are sustained fully by the record but that the burden of plaintiffs to establish unconstitutionality of the statute, more exacting than the usual fact-finding issue in civil controversy, to overcome the strong presumption of statutory constitutionality has not been met (Matter of Van Berkel v. Power, 16 N Y 2d 37, 40; Wiggins v. Town of Somers, 4 N Y 2d 215, 218-219; Matter of Spielvogel v. Ford, 1 N Y 2d 558, 562).
The evidence is of sufficient legal effect to permit the Special Term to reach, and the Appellate Division to affirm, the essential factual conclusion on which the decision for defendants is based.
If, therefore, there be a relation between the present requirement of section 54-b and safety, as it has been found, the full crew regulation by the New York Legislature is constitutional and, in the absence of Federal pre-emption, a valid exercise of the State’s police power (Chicago, R. I. & P. Ry. Co. v. Arkansas, 219 U. S. 453, 466; St. Louis & Iron Mountain Ry. v. Arkansas, 240 U. S. 518; Missouri Pac. R. R. Co. v. Norwood, 283 U. S. 249, 809; 13 F. Supp. 24, affd. 290 U. S. 600; Engineers v. Chicago, R. I. & P. R. R. Co., 382 U. S. 423). This field has not been federally pre-empted (Engineers v. Chicago, R. I. & P. R. R. Co., 382 U. S. 423, supra).
The precise question now here, asserted on substantially the same constitutional arguments by plaintiff New York Central Railroad, was addressed to the Indiana full crew law of 1937 in the Indiana Supreme Court in Public Serv. Comm. v. New York Cent. R. R. Co. (216 N. E. 2d 716 [1966], cert. den. 385 U. S. 843). The court held the asserted technological advances in railroad operations since 1937 were insufficient to *16 require invalidation of the statute in its present application and that the Indiana statute was not in violation of the due process clauses of the United States or State Constitutions or of the equal protection or Federal commerce clauses.
An Ohio decision (Akron, Canton & Youngstown R. R. Co. v. Public Utilities Comm. of Ohio, 9 Ohio Misc. 183, 193 [1967]) deals in particular with the diesel engine-fireman problem and holds the statute of that State making a requirement similar to section 54-b is valid. The court observed that the dangers sought to be avoided when the statute was enacted have not “ lessened to such an extent that the minimum crew requirements are now clearly unreasonable and arbitrary ’ ’. This very closely parallels the reasoning in this present case by the court at Special Term.
Nor does the decision of the United States District Court in Arkansas in 1967 the other way (Chicago, R. I. & P. R. R. Co. v. Hardin, 274 F. Supp. 294) require the decision of the Special Term be reversed. The Arkansas case turned on different fact-finding: ҅ ҅ We find from the evidence as a whole that under present conditions continued enforcement of the statutes makes no significant contribution to railroad safety ’ ’ (p. 303). This view of the facts of that record is merely different from the Special Term’s view of this record. It certainly does not follow that the New York court is necessarily wrong about its view.
Thus, the argument of plaintiffs that the statute as now applied deprives them of due process and is confiscatory is not sustained by the record and by the findings. (See, e.g., Seagram & Sons v. Hostetter, 384 U. S. 35; Central Sav. Bank v. City of New York, 280 N. Y. 9.)
Plaintiffs do not establish on the record that the statute denies them equal protection of the laws. Differences in the impact of statutes depend for validity on the rationality of the differences (Morey v. Doud, 354 U. S. 457, 465) and some differences applying specifically to railroads have been sustained by this court (New York Cent. & H. R. R. R. Co. v. Williams, 199 N. Y. 108, 123). The equal protection argument was advanced in similar context without effect in Missouri Pac. R. R. Co. v. Norwood (283 U. S. 249, 252, supra). Nor is the statute a burden on interstate commerce (Chicago, R. I. & P. Ry. Co. v. *17 Arkansas, 219 U. S. 453, supra), a case which also deals with the equal protection problem.
The order should be affirmed, with costs.

. Of course, a different issue would be involved with perhaps a different conclusion if, with the abolition of the rigidly constituted train crews under the repealed statutes (§§ 54-a and 54-c), train crews and engine crews were fungible. But the history of the statutes and the argument by the parties, as well as the thrust of the majority view, is that the engine crew <of two is inviolate, that is, that the functions of that crew cannot be performed by members of the train crew, however otherwise qualified. Or put the other way around, the members of the engine crew cannot perform any of the functions normally performed by the train crew.