# BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN ET AL. *v.* CHICAGO, ROCK ISLAND & PACIFIC RAILROAD CO. ET AL.

No. 16.   Argued October 22, 1968.—Decided November 18, 1968.*

---

*Together with No. 18, *Hardin, Prosecuting Attorney, et al.* v. *Chicago, Rock Island & Pacific Railroad Co. et al.*, on appeal from the same court.

*James E. Youngdahl* argued the cause for appellants in No. 16. *Leslie Evitts,* Chief Assistant Attorney General of Arkansas, argued the cause for appellants in No. 18. With them on the briefs were *Joe Purcell,* Attorney General of Arkansas, *Robert D. Ross,* and *John P. Sizemore.*

*Robert V. Light* and *Martin M. Lucente* argued the cause for appellees in both cases. With them on the brief were *W. J. Smith, H. H. Friday,* and *R. W. Yost.*

MR. JUSTICE BLACK delivered the opinion of the Court.

These cases raise the question whether the Arkansas "full-crew" laws, specifying a minimum number of employees who must serve as part of a train crew under certain circumstances, violate the Commerce Clause or the Fourteenth Amendment. The constitutionality of these Arkansas laws has been specifically upheld against challenges under the same constitutional provisions in three decisions of this Court, in 1911, in 1916, and again in 1931.[1] In the present cases, however, the District Court found that as a result of economic and technical

---

[1] *Chicago, R. I. & P. R. Co.* v. *Arkansas,* 219 U. S. 453 (1911); *St. L., I. M. & S. R. Co.* v. *Arkansas,* 240 U. S. 518 (1916); *Missouri Pac. R. Co.* v. *Norwood,* 283 U. S. 249 (1931), 290 U. S. 600 (1933). The Court's holdings in these cases were also reaffirmed, in dictum, in *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 782 (1945).

developments since our last decision on this subject, the statutes were no longer justified as safety measures, the ground on which they had formerly been sustained, and struck them down as contrary to the Commerce Clause of the Constitution and the Due Process Clause of the Fourteenth Amendment. 274 F. Supp. 294 (D. C. W. D. Ark. 1967). We noted probable jurisdiction, 390 U. S. 941 (1968). We disagree with the District Court's holding that the railroads have shown a change in circumstances sufficient to justify departure from our three previous decisions. We therefore reaffirm those cases and reverse the judgment of the District Court.

The first of the two statutes challenged here was enacted in 1907, and this law makes it an offense for a railroad operating a line of more than 50 miles to haul a freight train consisting of more than 25 cars, unless the train has a crew of not "less than an engineer, a fireman, a conductor and three [3] brakemen . . . ." [2] The second statute, enacted in 1913, makes it an offense for any railroad with a line of 100 miles or more to engage in switching operations in cities of designated populations, with "less than one [1] engineer, a fireman, a foreman and three [3] helpers . . . ." [3] These two statutes, the constitutionality of which this Court previously upheld, are precisely the statutes here challenged and struck down.

This latest attack on these Arkansas laws was commenced by a group of interstate railroads operating in Arkansas which asked the United States District Court to declare the statutes unconstitutional and enjoin two Arkansas prosecuting attorneys, appellants here, from enforcing them. The railroad brotherhoods, also appel-

---

[2] Ark. Laws 1907, Act 116, Ark. Stat. Ann. §§ 73–720 through 73–722 (1957 Repl. Vol.).

[3] Ark. Laws 1913, Act 67, Ark. Stat. Ann. §§ 73–726 through 73–729 (1957 Repl. Vol.).

lants here, were allowed to intervene in the District Court in order to defend the validity of the state statutes. In their complaint appellees charged that both statutes (1) operate in an "arbitrary, capricious, discriminatory and unreasonable" manner in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment; (2) unduly interfere with, burden, and needlessly increase the cost of interstate transportation in violation of the Commerce Clause, Art. I, § 8, cl. 3, of the Constitution, and contrary to the National Transportation Policy expressed in the Interstate Commerce Act; (3) discriminate against interstate commerce in favor of local or intrastate commerce; and (4) invade a field of federal legislation pre-empted by the Federal Government primarily through Pub. L. 88–108, passed by Congress in 1963 [4] to avert a nationwide railroad strike.

In its first opinion in these cases, the District Court granted the railroads' motion for summary judgment, holding that the field of full-crew legislation was pre-empted by Pub. L. 88–108, 239 F. Supp. 1 (D. C. W. D. Ark. 1965), but we reversed on the pre-emption question, *sub nom. Engineers* v. *Chicago, R. I. & P. R. Co.*, 382 U. S. 423 (1966). We also held that the railroads were not entitled to summary judgment on their alternative theory that because the effect of the mileage exemption in the two Acts is to free all of the State's intrastate railroads from the full-crew requirements while ensuring coverage of most of the interstate railroads, the two Acts "constitute discriminatory legislation against interstate commerce in favor of intrastate commerce." *Id.*, at 437–438. On remand the District Court held an evidentiary hearing and, after compiling a voluminous record, found that the full-crew requirements had "no substantial effect on safety of operations," placed "substantial financial burdens" upon the carriers, and caused

---

[4] 77 Stat. 132, 45 U. S. C. following § 157.

"some delays" and interference with the continuity of railroad operations. On the basis of these findings the District Court held the Arkansas laws unconstitutional as impermissible burdens on interstate commerce and also ruled that because the laws were "unreasonable and oppressive" they violated the Due Process Clause of the Fourteenth Amendment. The court did not reach the railroads' further argument that the Arkansas laws discriminate against interstate commerce in favor of intrastate commerce in violation of the Commerce and Equal Protection Clauses. Appellants challenge both the accuracy of the District Court's findings and holdings and their relevance to adjudication of the constitutional issues presented. They ask us to hold that the Arkansas laws do not impermissibly burden interstate commerce or otherwise violate any provision of the Constitution.

## I.

The question of crew size has been a subject of dispute between the railroads and their employees for more than half a century. Much of the controversy has of course been fought out by collective bargaining between the railroads and the unions.[5] In many States attempts have been made to settle the controversy by legislation. The Arkansas statutes before us were passed in 1907 and 1913, along with a number of other laws designed to further railroad safety, such as headlight standards, regulations concerning the obstruction of train crossings, and so on.[6] Many other States have also passed full-crew laws as parts of detailed codes regulating railroad safety.[7]

---

[5] The long and troublesome history of this aspect of the dispute is briefly summarized in our prior opinion in these cases, 382 U. S., at 430–432.

[6] See, e. g., Ark. Stat. Ann. §§ 73–704 through 73–706; 73–718, 73–719 (1957 Repl. Vol.).

[7] The approach taken in other States is summarized in the opinion of the District Court in these cases, 274 F. Supp., at 299.

These safety codes, and the full-crew provisions in particular, have been subject to continual re-evaluation throughout the country. In New York, for example, the Public Service Commission in 1960 recommended total repeal of the State's full-crew legislation, and in 1966 two of the three New York laws in the field were repealed, but the legislature explicitly rejected a proposal to repeal the third law, which requires both a fireman and an engineer to be on duty in the engine cab, in addition to the brakeman who serves in the cab on freight hauls.[8] In Arkansas the railroad safety laws have similarly been subject to close scrutiny. Additional safety requirements have been added from time to time,[9] and some safety requirements considered out of date have been repealed.[10] With respect to the full-crew statutes specifically, a proposal to repeal these statutes was placed on the ballot for popular referendum in 1958 and was decisively defeated by the voters. Congress too has been concerned with the problem of the rules governing crew size and in 1963 passed a statute referring the dispute between the railroads and the unions to arbitration, but as we held in our prior decision, Congress was aware of state full-crew laws and did not intend to override them. 382 U. S., at 429–437.

In spite of this background of frequent and recent legislative re-evaluation of the full-crew problem, both at the state and national levels, the railroads now ask us to determine as a judicial matter that these laws no longer make a significant contribution to safety and so

---

[8] See *New York Central R. Co.* v. *Lefkowitz*, 23 N. Y. 2d 1, 241 N. E. 2d 730 (1968).

[9] *E. g.*, Ark. Laws 1951, Act 253, Ark. Stat. Ann. § 73–740 (1957 Repl. Vol.); Ark. Laws 1953, Act 130, Ark. Stat. Ann. §§ 73–741 through 73–744 (1957 Repl. Vol.).

[10] *E. g.*, Ark. Laws 1965, Act 501, Ark. Stat. Ann. § 73–730 (Supp. 1967).

seriously burden the railroads in their operations that they should no longer stand under the Commerce Clause. The essence of the railroads' position is that the requirement of additional crewmen amounts to nothing more than featherbedding. They claim that the firemen once needed to tend the furnaces on steam locomotives are not necessary on the diesel engines now generally in use. Although the railroads recognize that the fireman performs a valuable lookout function on passenger trains, where he and the engineer are the only crewmen in the engine cab, they assert that in both freight hauling operations and yard switching operations other railroad employees are available to provide an adequate lookout and assist the engineer in correcting mechanical problems and performing other miscellaneous duties. The railroads thus maintain that the firemen, and some of the other required crewmen, perform no useful function and make no significant contribution to safety. At the same time, the railroads contend, the full-crew requirements substantially increase their cost of operation, hampering their ability to improve railroad service and to compete with other modes of transportation, and also burden commerce by requiring interstate trains passing through Arkansas to slow down or stop at the border to pick up and let off the extra crewmen.

The State of Arkansas and the railroad brotherhoods, all appellants here, take a different view of the functions performed by the firemen and other additional crewmen required under the statutes. They claim that the work performed by these employees—serving as lookout, passing signals, relieving the engineer in emergencies, inspecting the engine and other cars, and helping to make needed adjustments and repairs while the train is moving—is still necessary and cannot be performed by other employees without unduly burdening them and interfering with the proper performance of their other tasks. Ap-

pellants argue that although some technological improvements have tended to eliminate safety hazards and lighten the work of the train crew, other developments, such as the increased size and speed of trains, the heavier automobile traffic over train crossings, and the competitive pressures for faster switching of trains, have had exactly the opposite effect.

The District Court analyzed these conflicting contentions and the conflicting evidence adduced to support them and concluded that the full-crew requirements have "no substantial effect on safety of operations." The court also said that even if these requirements did add "some increment of safety to the operation, we think that such an increment is negligible . . . and not worth the cost." As additional factors justifying its conclusion that the laws created an unconstitutional burden on interstate commerce, the court emphasized "the financial burden of compliance, which is out of all proportion to the benefit, if any, derived, and the added burden involved in the taking on and discharging men at or near the Arkansas State line . . . ."

We think it plain that in striking down the full-crew laws on this basis, the District Court indulged in a legislative judgment wholly beyond its limited authority to review state legislation under the Commerce Clause. The evidence as to the need for firemen and other additional crewmen was certainly conflicting and to a considerable extent inconclusive. Many railroad employees gave direct testimony as to incidents in which, for example, the presence of a fireman as a lookout helped avert a serious accident. With respect to statistical evidence, the District Court itself noted: "The statistical evidence as to the effect upon safety of the reductions in force authorized by the basic award and by the awards of the special adjustment boards [under the 1963 arbitration] is not entirely satisfactory either way . . . ." Indeed, as the

court below recognized, the statistics showed that railroad accidents had actually increased during the period from 1964–1966, when the size of train crews was being reduced.[11]

It would hardly be possible to summarize here all the other evidence in the record relevant to the safety question, and, as we have indicated, it is wholly unnecessary to do so. A brief summary of some of the findings of Arbitration Board No. 282, the panel set up pursuant to Pub. L. 88–108, should suffice to show that the question of safety is clearly one for legislative determination. In quoting from this report, of course, we in no way intend to indicate that the District Court should have accepted any of its specific conclusions or that this evidence was necessarily any more persuasive than any of the many other sources of information about the problem. We single it out only because it is one of the more recent reports and because it was heavily relied upon by the District Court and by the railroads themselves. The Board stated as its very first finding:

"1. The record contains no evidence to support the charge, frequently and irresponsibly made, that firemen presently employed in road freight and yard service throughout the country are being paid to do nothing and actually perform no useful work."

The Board then went on to deal specifically with the various functions for which firemen were claimed to be necessary. It concluded that firemen were not necessary to perform the lookout function in "the great majority of cases" and that they were not needed to perform cer-

---

[11] The District Court dealt with this fact by simply stating that this trend had been observed in years preceding the effective date of the arbitration award and concluding: "Why accident rates have been increasing we do not know with certainty, but it would be pure speculation to say that crew size has had anything to do with it."

tain mechanical duties. The Board also held, however, that in order to insure relief of an engineer who becomes incapacitated while operating the train, firemen were clearly necessary in yard service on engines that were not equipped with a fully operative dead-man control, and the record before us in the present cases indicates that a substantial percentage of the engines operated in Arkansas are not equipped with this device. Although the Board thus thought that firemen could be eliminated in most cases, the Board emphasized:

"[W]e are satisfied that a certain number of such assignments require the continued employment of firemen in order to prevent excessive safety hazard to lives and property, to avoid imposing an undue burden upon the remaining crew members, and to assure adequate and safe transportation service to the public."

Finally, and most significant, the Board itself stressed in conclusion the subjective nature of its findings with reference to safety:

"Safety is, of course, essentially a relative concept; once adequate minimum standards have been achieved, the decision as to how much more safety is required must necessarily be governed by all the accompanying circumstances. Railroading is, unfortunately, a hazardous occupation, and the problem before us cannot be viewed simply in terms of preventing or not preventing accidents."

This summary, taken from evidence heavily relied upon by the railroads and generally favorable to their position, leaves little room for doubt that the question of safety in the circumstances of this case is essentially a matter of public policy, and public policy can, under our constitutional system, be fixed only by the people acting through their elected representatives. The District Court's re-

sponsibility for making "findings of fact" certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was "pure speculation."

Of the other matters relied upon by the District Court, the problem of delay at the state borders apparently has not changed appreciably since the days of this Court's earliest full-crew decisions, and this Court's statement of the insignificance of the problem in *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 782 (1945), is equally valid today:

> "While the full train crew laws undoubtedly placed an added financial burden on the railroads in order to serve a local interest, they did not obstruct interstate transportation or seriously impede it. They had no effects outside the state beyond those of picking up and setting down the extra employees at the state boundaries; they involved no wasted use of facilities or serious impairment of transportation efficiency . . . ."

Nor was it open to the District Court to place a value on the additional safety in terms of dollars and cents, in order to see whether this value, as calculated by the court, exceeded the financial cost to the railroads.[12]   As we said

---

[12] The record contains no meaningful estimate of what this cost actually is.  The railroads computed the total wages paid per year to the allegedly unnecessary employees and claimed that this total figure, $7,600,000, represents the cost of compliance.  But it was admitted that the net cost is actually lower than this because elimination of the additional crewmen would create new expenses, such as the special compensatory allowance paid to engineers who operate without the assistance of a fireman, additional overtime pay, and other costs associated with somewhat slower operations in terminals

in *Bibb* v. *Navajo Freight Lines,* 359 U. S. 520 (1959), where the District Court had struck down an Illinois law requiring trucks to be equipped with contour mudguards, on the ground that the equipment had no safety advantages and was very costly to install and maintain:

> "Cost taken into consideration with other factors might be relevant in some cases to the issue of burden on commerce. But it has assumed no such proportions here. If we had here only a question whether the cost of adjusting an interstate operation to these new local safety regulations prescribed by Illinois unduly burdened interstate commerce, we would have to sustain the law under the authority of the *Sproles* [286 U. S. 374 (1932)], *Barnwell* [303 U. S. 177 (1938)], and *Maurer* [309 U. S. 598 (1940)] cases. The same result would obtain if we had to resolve the much discussed issues of safety presented in this case." *Id.,* at 526.[13]

It is difficult at best to say that financial losses should be balanced against the loss of lives and limbs of workers and people using the highways. We certainly cannot do so on this showing.

## II.

We deal next with the contention that because of the mileage exemption, the full-crew laws discriminate against interstate commerce in favor of intrastate commerce. This contention, like the railroads' other claims,

---

and en route. The railroads introduced no evidence to indicate the approximate amount of such new expenses, and we have no way of knowing whether, as appellants claim, these expenses would to a substantial extent offset the wage savings associated with the reduction in crew sizes.

[13] Although we struck down the Illinois law in *Bibb,* we did so on the carefully limited basis that the contour mudguard requirement flatly conflicted with laws, enforced in at least one other State, that trucks must be equipped with straight mudguards.

was of course specifically rejected in this Court's earlier decisions dealing with these same Arkansas statutes. We noted in our prior opinion in the present cases that the effect of the mileage exemptions was to free all of the State's 17 intrastate railroads from the coverage of the Acts, while 10 of the 11 interstate railroads are subject to the 1907 Act, and eight of them are subject to the 1913 Act. We went on to say, however, that the difference in treatment based on differing track mileage might have a rational basis, and we therefore held that the mileage classification could not, "on the record now before us," be considered a discrimination in violation of the Commerce and Equal Protection Clauses. 382 U. S., at 437.

Despite the extensive testimony and exhibits added to the record since our previous consideration of these cases, we have found no basis for altering our conclusion that the mileage classification is permissible. The railroads argue that the extra men, if needed at all, are equally necessary on all trains, regardless of whether the company operating them happens to own a more or a less extensive system of track. But evidence in the record establishes a number of legitimate reasons for the mileage exemption. In the case of at least one of the short-line roads, the maximum speed for trains running over its main track is 35 miles per hour, while trains moving over the longer lines have speed limits of 65 and in some cases 75 miles per hour. The apparent use of much slower trains over the short lines certainly provides a basis upon which the Arkansas Legislature could conclude that the hazards encountered in line-haul operations are less serious, and accordingly that the need for regulation is less pressing, on the short lines. Similarly in connection with the switching operations, there was evidence that the usefulness of additional employees depends to some extent on the length of the train being switched,

another factor that—like speed—tends to vary according to the railroad's total trackage. Finally, the legislature could also conclude that the smaller railroads would be less able to bear the cost of additional crewmen, even though the total additional cost would of course tend to be smaller in the case of the smaller companies.

Although the railroads claim that other criteria could provide a more precise test of the situations where a larger crew is desirable, these other standards have inadequacies of their own, and are for the most part far too vague to provide a basis for a statutory classification. And in any event the courts may not force a state legislature to attain scientific perfection in determining the coverage of statutes of this type. As we stressed in the *Bibb* case, 359 U. S., at 524:

> "These safety measures carry a strong presumption of validity when challenged in court. If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective. Policy decisions are for the state legislature, absent federal entry into the field."

Mileage classifications have repeatedly been upheld on this basis, not only in this Court's previous decisions dealing with these very statutes but in many other cases involving similar problems. See, *e. g., New York, N. H. & H. R. Co.* v. *New York,* 165 U. S. 628 (1897). Nothing suggests that full-crew laws should now be treated differently.

## III.

There remains for consideration only the railroads' contention that the Arkansas laws violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Little need be said of the claim that the statutes violate the Equal Protection Clause for the reason that they discriminate against the railroad industry

by singling it out for regulation and making no provision for minimum crews on "motor buses, taxicabs, airplanes, barges, cargo trucks, or any other segment of the transportation industry." The statutes as written, requiring, for example, not "less than an engineer, a fireman, a conductor and three [3] brakemen," could scarcely be extended in their present terms to such means of transportation as taxicabs or airplanes. Nor was the legislature, in attempting to deal with the safety problems in one industry, required to investigate the various differing hazards encountered in all competing industries and then to enact additional legislation to meet these distinct problems.

The railroads also argue that the statutes violate the Due Process Clause because they are "unduly oppressive" and impose costs on the regulated industry that exceed the public benefits of the regulation. The District Court agreed with this position, holding that the impact of the full-crew laws today is "unreasonable and oppressive" and therefore a violation of due process. Insofar as these arguments seek to present an independent basis for invalidating the laws, apart from any effect on interstate commerce, we think, with all due deference to appellees and the District Court, that these contentions require no further consideration. *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Olsen* v. *Nebraska,* 313 U. S. 236 (1941); *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (1937); *Nebbia* v. *New York,* 291 U. S. 502 (1934).

## IV.

Under all the circumstances we see no reason to depart from this Court's previous decisions holding that the Arkansas full-crew laws do not unduly burden interstate commerce or otherwise violate the Constitution. Undoubtedly heated disputes will continue as to the extent

to which these laws contribute to safety and other public interests, and the extent to which such contributions are justified by the cost of the additional manpower. These disputes will continue to be worked out in the legislatures and in various forms of collective bargaining between management and the unions. As we have said many times, Congress unquestionably has power under the Commerce Clause to regulate the number of employees who shall be used to man trains used in interstate commerce. In the absence of congressional action, however, we cannot invoke the judicial power to invalidate this judgment of the people of Arkansas and their elected representatives as to the price society should pay to promote safety in the railroad industry. The judgment of the District Court is reversed, and the cases are remanded to that court with instructions to dismiss the complaint.

*It is so ordered.*

MR. JUSTICE FORTAS took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, dissenting.

I would agree with the Court that if the constitutionality of these Arkansas laws were to be judged as safety measures under the State's police power, they would have to be sustained. But as I indicated in my dissent in *Engineers* v. *Chicago, R. I. & P. R. Co.*, 382 U. S. 423, 438, Congress in enacting Pub. L. 88–108, 77 Stat. 132, undertook to displace state "full-crew" laws by delegating power to a national arbitration board to determine, for example, the necessity of firemen on diesel freights and the minimum size of train and switching crews.

I would, therefore, remand the cases to the District Court for further proceedings consistent with Pub. L. 88–108 and the awards that have been made under it.