**Joan L. BREHM and Mark J. Brehm, Appellants,**

v.

**Patricia Roberts HARRIS, Secretary of Health, Education and Welfare, Appellee.**

No. 79–1870.

United States Court of Appeals, Third Circuit.

Argued Jan. 10, 1980.

Decided April 14, 1980.

---

**20.** We need not reach the issue of Mellon's entitlement to prejudgment interest.

Thomas M. Place (argued), Carlisle, Pa., for appellants.

Larry H. Bailine (argued), Asst. Regional Atty., Stephanie W. Naidoff, Regional Atty., Philadelphia, Pa., Carlan M. O'Malley, Jr., U.S. Atty., Daniel A. Derose, Asst. U.S. Atty., M. D. Pennsylvania, Harrisburg, Pa., for appellee.

Before SEITZ, Chief Judge, and ADAMS and WEIS, Circuit Judges.

### OPINION OF THE COURT

WEIS, Circuit Judge.

Three years after he began receiving social security disability benefits, Cloyd E. Brehm and his wife adopted Mark as their son. HEW refused to make child insurance payments for Mark because the Social Security Act required that he have lived with and been dependent on Cloyd for a year before his disability began. Mark argues that he has been denied equal protection because under the Act, afterborn natural children, as well as afteradoptees who are stepchildren or natural children of the wage earner, are eligible for benefits. We conclude that Mark's challenge must fail because the classification in the Act is within the competence of Congress and is not unconstitutional.

Wage earner Cloyd E. Brehm began receiving social security disability payments in 1972. Two years later, 16 year old Mark, who was not related to Cloyd or his wife Joan, began living with them. In 1975, after completing the investigation required by state law, the Court of Common Pleas of Cumberland County, Pennsylvania, decreed that Mark was formally adopted as a son by Cloyd and Joan Brehm. In the following month, Mark applied for social security child insurance benefits. A few weeks later Joan filed for the payments due the wife of a disabled wage earner when she is caring for a child entitled to benefits. 42 U.S.C. § 402(b)(1) (1976 & Supp. II 1978). HEW

denied both claims on the ground that the Social Security Act required that afteradopted children live with and receive one-half of their support from the wage earner for one year before the onset of the disability. Since these conditions had not been met, neither Mark nor Joan, whose eligibility was derivative through Mark, was entitled to benefits.

The Brehms appealed to the district court, contending that denying benefits to an adopted but not otherwise related child while granting compensation to afterborn natural children and afteradopted stepchildren was unconstitutional. Finding no dispute on the facts, the district court entered summary judgment for the Secretary.

The claimants attack the statute as violating the fifth amendment's guarantee of equal protection and due process. They argue that since natural children born after the onset of the wage earner's disability are entitled to benefits, as are afteradopted stepchildren, 42 U.S.C. § 402(d)(3), (8)(C) (1976), the exclusion of other afteradopted children who in fact become dependent on the disabled parent lacks a rational basis. The Brehms contend that congressional fear of sham adoptions is unfounded since the court decree here, as would be true in other states, was issued only after thorough investigation of the circumstances and consideration of the child's welfare. *See, e. g.,* Pa.Stat.Ann. tit. 1, §§ 331, 335, 501 (Purdon Supp. 1978).

We begin our discussion with a brief review of the statute's history. After enacting the provisions of the Social Security Act establishing retirement and disability payments to eligible participants, Ch. 836, § 103(a), 70 Stat. 815 (1956); Ch. 531, tit. II, 49 Stat. 622 (1935), Congress responded to the need to provide for the wage earner's dependents. It recognized that when a wage earner retires or is physically unable to continue work, his income is reduced and his dependents consequently suffer a diminution in the amount of their support. To satisfy this need, the Act was amended to provide secondary benefits for a spouse and children. With due allowance for the solvency of the program and the need to prevent abuse, various categories of eligibility were defined and modified by amendments over the years.

In some circumstances the standards governing benefits for dependents of a disabled wage earner differed from those applicable to dependents of a retired worker. For example, children adopted after the wage earner's eligibility for disability benefits had accrued were not required to establish their earlier dependence on the wage earner, unlike afteradopted children of retired wage earners. In 1972, Congress eliminated this disparity and created a single standard. The amendment enacted in that year provided that there would be no payments to a child adopted after a wage earner became entitled to benefits for disability or retirement unless the child:

   (1) was the natural child or stepchild of the wage earner, or

   (2) was adopted by court decree, and

     (a) was living with the wage earner for a year before he became entitled to benefits, and

     (b) received at least half support from the wage earner.

42 U.S.C. § 402(d)(8) (1976).[1]

The House Report articulated several reasons for concluding that amendments were

---

1. 42 U.S.C. § 402(d)(8) (1976) reads in relevant part:

   "In the case of—

     (A) an individual entitled to old-age insurance benefits . . . or

     (B) an individual entitled to disability insurance benefits, . . .

   a child of such individual adopted after such individual became entitled to such old-age or disability insurance benefits shall be deemed not to meet the [dependency] requirements of

[42 U.S.C. § 402(d)(1)(C)(i), (iii) (1976)] unless such child—

   (C) is the natural child or stepchild of such individual (including such a child who was legally adopted by such individual), or

   (D)(i) was legally adopted by such individual in an adoption decreed by a court of competent jurisdiction within the United States,

   (ii) was living with such individual in the United States and receiving at least one-half

necessary. The Ways and Means Committee thought the rules governing benefits for afteradopted children were too complex and the same standards should apply to claims derivative from those of both retired and disabled workers. The report also explained that "benefits for a child who is adopted by a worker already getting old-age or disability benefits should be paid only when the child lost a source of support because his parent retired or became disabled, and that the law should include safeguards against abuse through adoption of children solely to qualify them for benefits." H.R.Rep.No.231, 92 Cong., 1st Sess. 52 *reprinted in* [1972] U.S.Code Cong. & Admin.News, 4989, 5039.

It is against this background that constitutional tests must be examined. The standard for reviewing classifications within the Social Security Act has been discussed at some length in a series of Supreme Court cases. Claimants rely principally on *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), which struck down a provision denying payments to certain afterborn illegitimate children of a disabled wage earner. The Court found that the primary purpose in creating children's benefits was to provide support for dependents of the wage earner. *Id.* at 634, 94 S.Ct. at 2500. Although recognizing a legitimate congressional interest in preventing abuse, the Court determined that the classification at issue was not reasonably related to that aim because the potential for spurious claims was "exactly the same" for both statutorily created subclasses of afterborn illegitimate children. *Id.* at 636, 94 S.Ct. at

2501.[2] Therefore, the statutory scheme conferring benefits on one subclass but not the other was found to violate the equal protection guarantee implicit in the fifth amendment's due process clause. *Id.* at 637, 94 S.Ct. at 2502.

A year later, the Court upheld the nine month duration-of-relationship requirement for social security survivors' benefits against a fifth amendment challenge. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In doing so, the Court looked to *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), for the proposition that the due process clause bars the withholding of a noncontractual benefit such as social security payments only "if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." 422 U.S. at 768, 95 S.Ct. at 2468, *quoting Flemming v. Nestor, supra* at 611, 80 S.Ct. at 1372.[3]

In reviewing permissible legislative objectives, *Salfi* observed that, in attempting to check abuses that it believes would unduly expand coverage of the social security program, Congress could impose fixed, prophylactic rules. *Id.* at 776, 95 S.Ct. at 2472. Although, in some cases, such regulations might prove to be over or underinclusive, they would promote the proper goals of certainty of coverage for those who meet their terms, and administrative economy in making eligibility determinations. As the Court said, "While it is possible to debate the wisdom of excluding legitimate claimants in order to discourage sham relationships, and of relying on a rule which may

---

of his support from such individual [entitled to old-age benefits] for the year . . . before . . . such individual became entitled to . . . benefits . . . or . . . if he is an individual [entitled to disability benefits] for the year immediately before the month in which began the period of disability of such individual which still exists at the time of adoption . . . and

   (iii) had not attained the age of 18 before he began living with such individual."

2. The statute conferred benefits on illegitimate children born after the onset of the wage earner's disability if the paternity of the wage earner had been established or if the children could

inherit their parent's personal property under state law, or were deemed illegitimate only because of a nonobvious defect in the parents' marriage ceremony. Other afterborn illegitimate children could not receive benefits. 42 U.S.C. §§ 402(d)(3)(A), 416(h)(2), (3)(B) (1976).

3. The Court also cited *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), as holding that a classification meeting the test articulated for the equal protection clause of the fourteenth amendment satisfies the due process standards of the fifth amendment. 422 U.S. at 770, 95 S.Ct. at 2469.

not exclude some obviously sham arrangements, we think it clear that Congress could rationally choose to adopt such a course." *Id.* At 781, 95 S.Ct. at 2475.

■ In the case at bench, the claimants bear the burden of establishing that the chosen classification is not reasonably related to this legislative purpose. *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). Arguments that the connection is based on assumptions that are not "scientifically substantiated," *Roth v. United States*, 354 U.S. 476, 501, 77 S.Ct. 1304, 1317, 1 L.Ed.2d 1498 (1957) (opinion of Harlan, J.) *quoted in James v. Strange*, 407 U.S. 128, 133, 92 S.Ct. 2027, 2030, 32 L.Ed.2d 600 (1972), are not persuasive. Nor is a classification invalid because the legislative history does not include statistical evidence supporting Congress's decision. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976). A court may not "reject [a] legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than . . . 'pure speculation.'" *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979), *quoting Brotherhood of Locomotive Firemen v. Chicago, Rock Island & Pacific Railroad*, 393 U.S. 129, 139, 89 S.Ct. 323, 328, 21 L.Ed.2d 289 (1968).

It is not the role of the judiciary to "hypothesize independently on the desirability or feasibility of any possible alternative basis for presumption. These matters of practical judgment and empirical calculation are for Congress." *Mathews v. Lucas, supra*, at 515, 96 S.Ct. at 2767. In discussing another limitation in a social security context, the Court said, "General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." *Califano v. Jobst*, 434 U.S. 47, 53, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977).

■ In applying these principles to the case *sub judice*, we conclude the claimants

have not established that the ineligibility of some afteradopted children does not further legitimate interests. Congress was apprehensive of an abuse of the social security system if benefits were paid to afteradopted children who were not the natural or stepchildren of the wage earner. As the Court of Appeals for the Second Circuit commented in *Clayborne v. Califano*, 603 F.2d 372 (2d Cir. 1979), Congress could have reasonably believed that "adoptions cementing a [direct] blood or matrimonial relationship would usually occur regardless of Social Security Act benefits because of the natural desire of relatives to formalize the relationship among members of family unit." *Id.* at 378. Since the same incentive is not necessarily present in the case of other afteradopted children, the risks posed by these two groups of adoptees are not identical. Thus, the *Jimenez* finding that two subgroups presenting the same likelihood of abuse were treated differently, does not control this case.

Claimants assert that empirical data is lacking and argue that there is substantial doubt that the attraction of additional benefits offer sufficient inducement to a disabled wage earner to undertake the extensive legal proceedings and obligations attendant on adoption. It may well be that the number of adoptions that would take place because of the expectation of added social security payments is insignificant. Nevertheless, the perception of abuse, its extent, and the measures required to check it are congressional concerns. Those who would set aside the legislative judgment have the heavy burden of convincing the court "that the legislative facts on which the classification is based could not reasonably be conceived to be true . . . .." *Vance .v. Bradley, supra* at 111, 99 S.Ct. at 949.

Nor does plaintiffs' reliance on extensive investigations in state adoption proceedings prove that congressional apprehension was unfounded. It is certainly conceivable that Congress could have believed that in some situations the state court would find that the child's best interest would be served

through adoption by a disabled wage earner in order to become eligible for income not otherwise available. Approving an adoption in part to confer legally available benefits on a child would not be fraudulent. Thus state procedures would not necessarily prevent those adoptions that Congress would consider abuses of the social security system.

Moreover, in designing the classification, Congress intended not only to prevent abuse but also to standardize eligibility requirements for the dependents of disabled and retired wage earners. H.R.Rep.No.231, 92d Cong., 1st Sess. 11, *reprinted in* [1972] U.S.Code Cong. & Admin.News, 4989, 4998. Before the 1972 amendments, an after-adopted child was not required to establish receipt of support from the wage earner before disability began, although such evidence was required when the worker was receiving old-age retirement rather than disability payments. We cannot say that the congressional determination to use the same standard for disability and retired cases was irrational, nor can we say that the choice to enact the stricter standard was not reasonable.

Our role in cases of this nature is a limited one, while the scope of congressional power to legislate is an expansive one. Congress has a justifiable interest in improving administrative efficiency. We recognize that concern should not be used to foster injustice, but yet, at some point in programs like social security, there must be a limitation on the amount of time and money spent simply in delivering benefits. Determining at what stage expense becomes prohibitive is a legislative and not a judicial function.

The claimants have made strong, logical arguments that an unfair discrimination has taken place. Nevertheless we cannot say that the legislation is not reasonably related to proper congressional aims. Accordingly, we join the other courts of appeals in rejecting the contention that § 402(d) is unconstitutional. *Clayborne v.*

*Califano, supra; Luna v. Secretary of HEW,* Unempl. Ins. Rep. (CCH) ¶ 16,195 (D.P.R.), *aff'd,* 588 F.2d 817 (1st Cir. 1978), *cert. denied,* 442 U.S. 935, 99 S.Ct. 2873, 61 L.Ed.2d 305 (1979); *Williams v. Mathews,* 441 F.Supp. 1045 (E.D.La.1977), *aff'd,* 566 F.2d 1044 (5th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978). *See also Stanton v. Weinberger,* 502 F.2d 315 (10th Cir. 1974).

The judgment of the district court will be affirmed.

ADAMS, Circuit Judge, concurring.

I can perceive only a slight possibility that a disabled wage earner would, or even could, adopt a child merely to qualify the child for Social Security Act benefits. More to the point, there appears to me, at least, to be little reason for believing that a disabled wage earner would be more likely to adopt a child unrelated by blood or marriage for this purpose, rather than a natural child or a stepchild. Nevertheless, I recognize that it is conceivable that Congress could have enacted § 402(d) with these justifications in mind. And I cannot say that it would have been irrational for Congress to have believed that precluding children adopted by an unrelated disabled wage earner from participating in the Act's child insurance program might further the legitimate purpose of safeguarding against abuse of the program. *Vance v. Bradley,* 440 U.S. 93, 97, 111, 99 S.Ct. 939, 943, 950, 59 L.Ed.2d 171 (1979). Accordingly, I concur in the result reached by the majority.

It might be well, however, for Congress as well as the Social Security Administration to reconsider whether the classification in question is not far broader and somewhat harsher than necessary to achieve the suggested purpose of protecting against sham adoptions aimed at gaining social welfare benefits. This seems to be particularly so in view of the carefully regulated nature of adoption procedures that now obtain in practically every state.[1]

---

1. As a general policy, adoption is encouraged by the states. Statutes in practically every

state and the District of Columbia, however, permit adoption only by court decree and only

after an investigation and report on the suita-
bility of prospective parents, an evidentiary
hearing by the judge, some period of super-
vised residency of the child in the prospective
home, and a finding by the judge that the
adoption is in the child's best interests. For a
table of citations to pertinent statutes see Ex-
hibit A, Appendix at 26A.