THE AKRON, CANTON & YOUNGSTOWN RAILROAD CO. ET *v.*
PUBLIC UTILITIES COMMISSION ET AL.

[Cite as Akron, Canton & Youngstown Railroad Co. v. Public Utilities Commission, 9 Ohio Misc. 183.]

184

(No. 220228—Decided January 30, 1967.)

Common Pleas Court of Franklin County.

*Joseph S. Gill, Messrs. Squire, Sanders & Dempsey, Mr. James C. Davis, Mr. Andrew P. Martin, Mr. Charles F. Clarke* and *Mr. Alan P. Buchmann,* for plaintiffs.

*Mr. William B. Saxbe,* attorney general, *Mr. Charles S. Lopeman, Mr. John F. Casey, Mr. Langdon Bell, Mr. C. Howard Johnson,* prosecuting attorney, *Mr. George C. Smith,* for defendants.

*Messrs. Tyler, Richards & Grieser, Mr. William A. Richards, Mr. C. Richard Grieser, Mr. Harold C. Heiss, Mr. Donald W. Bennett,* for intervening defendants.

SHOEMAKER, J.   The plaintiffs (hereinafter called Railroads), fifteen Class I railroads, all engaged in the business of transporting freight, or freight and passengers, in interstate commerce, in the state of Ohio, have brought this action for a judgment declaring that the interpretation of the word "firemen" in Sections 4999.07 and 4999.08, Revised Code (commonly called Full Crew Laws), does not require a "fireman" on a Diesel-electric locomotive.   If the court should interpret said statutes to require a "fireman" on a Diesel-electric locomotive, then plaintiffs claim said statutes are unconstitutional as an arbitrary and unreasonable exercise of the police power; that it deprives plaintiffs of their property without due process of law, and imposes an unreasonable burden upon interstate commerce, all in violation of the Constitution of Ohio and the United States.

The defendants are public officers, charged with the duty of enforcing said laws, and the Intervenors-Defendants (hereinafter called Brotherhoods), are labor organizations which represent operating employees of the railroads.

Section 4999.07, Revised Code, is as follows:

"No superintendent or other employee of a railroad company shall send or cause to be sent out on the main track, a through freight train with less than one engineer, one fireman, one conductor, and two brakemen, or send or cause to be sent out on the main track a light engine without cars to a point more than three miles from original starting point with less than one engineer, one fireman, and one conductor or flagman. Whoever violates this section shall be fined not less than one hundred dollars for each offense.

"The Court of Common Pleas has final jurisdiction under this section. The public utilities commission shall enforce this section and prosecute any violations thereof."

Section 4999.07, Revised Code, can be traced back to Sections 3365-30 and 3365-31, Revised Statutes. These sections were enacted on May 2, 1902 as House Bill No. 325, "An Act to better protect the lives of railway employees and the travelling public." 95 Laws of Ohio, 337.

The pertinent provisions of Section 4999.08, Revised Code, are:

"No common carrier owning or operating an engine or locomotive used to switch cars shall operate such engine or locomotive handling cars in any railroad yard or on any railroad track within the limits of this state unless every such engine or locomotive, while so handling or switching such cars, is manned with a full crew of competent employees, which crew shall consist of at least one engineer, one fireman, one conductor, and two helpers. No such employee shall be detailed to more than one engine at the same time to be put to any other service unless his place is filled by another competent employee * * *.

"Any common carrier which violates this section shall be fined not less than one hundred nor more than five thousand dollars."

Section 4999.08, Revised Code, can be traced back to House Bill No. 35, 103 Laws of Ohio, 191 (1913), entitled "An Act

to provide the least number of men that may be employed on switch engines, or engines engaged in switching cars, and the penalty for violation thereof.''

Incidentally, plaintiffs are not requesting the court to interpret or declare unconstitutional Section 4999.06, Revised Code, entitled ''running *passenger trains* with less than full crew.'' (Emphasis supplied.)

The primary thrust of plaintiffs' argument is that the word ''fireman'' as used in the statutes involved, is a plain and unambiguous word which must be construed according to its ordinary and common usage at the time of the passage of the statutes and, so construed, means ''A man who tends or feeds fires; a stoker.'' This is basically a dictionary definition at that time.

The Brotherhoods contend the evidence refutes the railroads' narrow definition and fails to define the whole job of a fireman prevalent on all railroads at that time. The Brotherhoods further contend that the cardinal principle of statutory construction is that statutes must be construed to accord with the constitutional basis of the statutes.

Before deciding the legal issues the court makes the following factual findings:

1. A fireman on a hand-fired steam engine on or about the time these statutes were enacted, performed many of the following duties:

1. He was a member of the engine crew working under the direction of the engineer. The engineer and fireman were the only members of the engine crew. The engineer's seat was always on the right side of the cab of the locomotive. The fireman's seat was always on the left side of the locomotive cab. The said engine crew worked with a train crew composed of a conductor, head brakeman and flagman. The conductor was in charge of the train.

2. He reported for duty thirty minutes before a train was ordered, and during this so-called prepatory time he would do the following:

a. Study the bulletin board.

b. Acquire necessary supplies including lubricating oil, engine oil, kerosene oil, lanterns, scoop shovels, shaker bar,

slack bar or fire broom, tank bucket, monkey wrench, coal maul or coal pick, flagging equipment including torpedos, fusees, and red, white and green flags.

c. Clean and fill lanterns, cab lights, and kerosene burning headlights on locomotive.

d. Proceed to the locomotive and mount the tender, swing the stanpipe and fill the tender with water. Enroute water was added by a scooping process if practical and available, if not, water was added from a water plug after the locomotive was detached in the same manner as stated above.

e. Supply drinking water for the engine crew.

3. After mounting the locomotive he would tend the fire in such a manner as to maintain proper steam pressure to provide necessary power. To do this he would scoop coal from an open space on the tender to the firebox. In extreme weather many times he would find it necessary to dig the coal down where he could shovel it from his natural position on the deck. He was the only employee charged with the responsibility of tending the firebox.

4. He would keep water in the crown sheet. The crown sheet was directly above the fire in the firebox. If water became low the fireman and/or the engineer had the responsibility to fill same by pumping the boiler. Without water the crown sheet would burn and cause a boiler explosion.

5. He would keep their engines clean, and must assist, when not otherwise engaged, in making such repairs as may be required.

6. When on the road, and not otherwise properly engaged, keep a careful watch upon the track, and instantly warn the engineer of any obstruction or signal perceived.

7. He must familiarize himself with all train rules, and must understand the use of signals and use them promptly when necessary.

8. He operated the locomotive under the direction and supervision of the engineer, and in relief of the engineer.

9. He was responsible for the engine any time the engineer was absent.

10. He must protect the front end of the train when necessary.

11. He must call signals to the engineer.

12. He must observe his train and passing trains for defects including "hot journals."

13. Relay signals to the engineer. All signals were passed on the engineer's side when practical. However, when not practical, the fireman received and passed signals to the engineer.

14. He must read all train orders and make certain they are complied with by the engineer. He also checked the engineer's compliance with all speed and signal regulations. If necessary, he must stop the locomotive.

The percentage of time that a fireman would spend tending the fire on a hand-fired locomotive, would vary according to the following considerations:

(1) Speed of the locomotive,

(2) Physical characteristics of the railroad,

(3) Weather conditions, particularly humidity,

(4) Tonnage pulled by locomotive.

For example, in yard service only approximately five to ten per cent of his time would be spent tending his firebox, which would probably be banked, and he would primarily tend the fire when the locomotive was not moving so that he could call and pass signals to the engineer and observe other situations while switching cars for the purposes of making safer movements.

A fireman in local freight service, while moving on the main track, would spend approximately 45% of his time tending the firebox, but would tend his fire in such a manner that during switching operations he would be on his seat box calling and passing signals to the engineer for safer movements.

On through freight services the loads were heavier, the engines operated at greater rates of speed with ordinarily less than five switching operations, and the fireman, when not operating the locomotive in relief of the engineer, would spend approximately 50% of his time tending his firebox and the other 50% of his time on his seat box.

The fireman was the only employee in the cab (other than the engineer) capable of operating the locomotive with knowledge of the engines, braking system, and operating skills.

The head brakeman ordinarily rode in the engine cab and also had lookout responsibilities, as did all other transporta-

tion employees. On some railroads the riding position of the brakeman limited his vision. He was not trained in the operation of the locomotive, not required by law to be in the cab, and ordinarily was on the ground during all switching operations as a member of the train crew.

Around 1917 steam engines began being equipped with stokers. Stokers moved coal from the coal tenders by means of a conveyor to the firebox where it was blown by steam jets into the firebox. Stokers were first used on through passenger service and through freight service because such service required substantially more coal to be hand shoveled into the firebox. Stokers were also used in local freight service which generally serviced communities and industries within seventy-five miles of the home yards. Stokers were not used in yard switching service. The fireman had two or more operating valves which would turn the stoker motor off or on and regulate the speed of the stoker motor. The injectors for the water pump were located on the fireman's side, as well as the stoker valves and were the responsibility of the fireman. Stokers substantially reduced the time the fireman would be off his seat box tending the firebox. Therefore, after this date the fireman would average 90% of his time on the fireman's seat when not operating the engine in relief of the engineer in all types of service.

Diesel Electric locomotives were used on the railroads starting approximately 1944 and all Ohio railroads were completely Dieselized by 1960. Diesel electric locomotives are all automatic. The engineer operates the throttle and the fuel oil is automatically injected. It is called a static system. The installation of stokers on steam engines substantially reduced the traditional "firing" duties of the fireman and the diesel-electric locomotives eliminated them.

When the railroads installed Diesel electric locomotives, they trained the engineer and fireman on the operation of said locomotive. They were taught to check such things as radiator water, fuel oil, lubricating oil, and any meters. Two instructers were assigned to a locomotive, with one continually with the engineer and one with the fireman. They would personally take the engineer and/or fireman through the engine room showing and explaining details of the Diesel electric locomotive. They were instructed on the operation of the throttle to elimin-

ate quick starts to prevent excessive slipping of the drivers, principles of dynamic braking, how to isolate an engine, and a knowledge of the gauges among other things. However, only minor adjustments may be made by a fireman or engineer to a Diesel electric locomotive. The fireman, however, does have a duty to make periodic examinations of the engine and working conditions.

The technology in the railroad industry has substantially improved in the last fifty years. The development of the Diesel electric locomotives has been a most important technological improvement. With such locomotives there are smoother starts and stops resulting in fewer shocks and hazards to freight, crew members and passengers.

Engine consists in freight operations—are ordinarily made up of multiple Diesel units—(It is possible to make up a consist of twelve multiple Diesel units operated by one engine crew—although such a consist would be most unusual)—which are better able to haul heavy tonnages on grades, thereby eliminating the need for cutting the train into sections and eliminating some of the hazards involved in the duties formerly performed by crew members during such operations.

Other improvements include air brake systems, coupling devices, use of roller bearings, new lubricating system, automatic detection devices, and roadbeds. New signal systems have automatic detection devices, and roadbeds. New signal systems have been installed using electric lights. Sound systems, including walkie-talkies and telephones, are used for purposes of communications.

The average size of freight cars and the length of trains have substantially increased, as well as the speed of the trains. Despite the installation and use of safety devices, hot boxes and dragging equipment still constitute hazards which require constant vigilance, if they are to be detected in time to prevent accidents. Collisions, derailments and other accidents still occur despite technological improvements.

The court will now discuss the legal issues.

The railroads strongly urge that the word "fireman" as used in said statutes, is a plain and unambiguous word which must be construed according to its ordinary and common usage at the time of the passage of the statutes. We agree. The railroads further state that so construed, the word "fireman"

means "A man who tends or feeds fires; a stoker." This is a dictionary definition published in the days when the statutes were enacted. However, to assume that the General Assembly completely disregarded the actual responsibilities of a fireman and merely picked up a dictionary without regard to railroad operations and the functions served by employees of railroads, is not a realistic view, in my judgment. Certainly the first responsibility of the fireman, after mounting the locomotive, was to tend his firebox to supply adequate steam pressure and power. However, he also performed important lookout duties, passed and called signals, checked the engineer to be certain he obeyed all train orders, signals and speed regulations. He was the other employee required by law in the cab of the locomotive. He was the only other employee able to operate the locomotive. He spent as much as 90% of his time doing duties other than tending the firebox in yard service.

Furthermore, the said statutes require one "fireman" on a train, engine or locomotive. The railroads contend that the court should interpret said statutes as requiring a fireman only on a *steam* engine or locomotive—not on a Diesel electric engine or locomotive. (Emphasis supplied.)

The primary rule in the construction of statutes is to arrive at the intention of the Legislature. In 50 Ohio Jurisprudence 2d, page 132, is stated:

"The courts may not read meaning into a law, but on the contrary must bring meaning out of it. They have no legislative authority and should avoid judicial legislation. It is their province to construe, or interpret, and not to make the law."

The General Assembly over the years has been aware that other types of power were and have become available and it has never amended the statutes to make a distinction between steam locomotives and other types thereof.

Sections 4999.07 and 4999.08, Revised Code, requiring the railroads to man every engine or locomotive with a full crew of competent employees, which crew shall consist of at least one engineer, one fireman, one conductor, and two helpers require the railroads to operate with one fireman on a Diesel electric locomotive.

The commonly called "full crew laws," which plaintiffs label as "excess crew laws," including Sections 4999.07 and 4999.08, Revised Code, are enactments of the General Assembly

192

under the legislative power granted to it by the Constitution of the state of Ohio. First is the general legislative power of the General Assembly to provide for the safety and welfare of the public in general. Specific legislative power and authority are granted under Article II, Section 34 of the Constitution of the state of Ohio:

"Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety, and general welfare of all employees; and no other provision of the Constitution shall impair or limit this power."

The railroads in their first cause of action contend that the Sections 4999.07 and 4999.08, Revised Code, to the extent that they require plaintiffs to operate with one fireman on each diesel electric locomotive, bear no real or substantial relation to the public health, safety, morals or general welfare, and constitute an unreasonable and arbitrary exercise of police power of the state of Ohio, which interferes with and deprives plaintiffs of their liberty and property, contrary to Article I, Section 1 and Article I, Section 19 of the Constitution of Ohio and without due course of law, contrary to Article I, Section 16 of the Constitution of Ohio, and contrary to the Fourteenth Amendment to the Constitution of the United States. The railroads argue that a fireman is not required on a Diesel electric locomotive because any duties not connected with maintaining the fire, formerly performed by firemen on steam locomotives, can now be performed efficiently and safetly on Diesel locomotives in freight service by other available employees. Therefore, because of technological improvements upon their railroads which promoted safety and reduced the hazards of railroad operations that their application to the railroads' operations today, are so unreasonable and burdensome under present conditions as to constitute a deprivation of property without due process of law.

The Ohio Supreme Court in *Benjamin* v. *City of Columbus*, 167 Ohio St. 103, said:

"Whether an exercise of the police power does bear a real and substantial relation to the public health, safety, morals or general welfare of the public and whether it is unreasonable or arbitrary are questions which are committed in the first instance to the judgment and discretion of the legislative body and, un-

less the decisions of such legislative body on those questions appear to be *clearly erroneous*, the courts will not invalidate them." (Emphasis supplied.)

In *State, ex rel. v. Brown*, 1 Ohio St. 2d 121, at page 123, the court said:

"Of course, the wisdom of legislation is not subject to judicial inquiry and legislative enactments are *presumptively constitutional*." (Emphasis supplied.)

The Supreme Court of the United States upheld the constitutionality of the full crew laws of Arkansas against attacks on the ground that they violated the due process and equal protection clauses of the Fourteenth Amendment, and the commerce and supremacy clauses of the United States Constitution. In that case, *Chicago, R. I. and Pacific Railway Company v. Arkansas* (1911), 219 U. S. 453, 466, the Arkansas Statute required a crew of one engineer, one fireman, one conductor and three brakemen on freight trains of 25 cars or more operated on any railroad of at least 50 miles in length. The court said:

"Under the evidence, there is admittedly some room for controversy as to whether the statute is or was necessary; but it cannot be said that it is so unreasonable as to justify the court in adjudging that it is merely an arbitrary exercise of power and not germane to the objects which evidently the state legislature had in view. It is a means employed by the state to accomplish an object which it is entitled to accomplish, and such means, even if deemed unwise, are not to be condemned or disregarded by the courts, if they have a real relation to that object. * * *."

With respect to the first cause of action, I conclude that plaintiffs have not established that Sections 4999.07 and 4999.08, Revised Code, deprived them of their property without due process of law when enacted. The court further concludes that the dangers sought to be avoided when the statutes were enacted, have not lessened to such an extent that the minimum crew requirements are now clearly unreasonable and arbitrary.

For their second cause of action the railroads allege that the further and continual enforcements of Sections 4999.07 and 4999.08, Revised Code, would result in an arbitrary and unreasonable discrimination against them and in favor of carriers of freight in Ohio competing with the railroads which are not subject to any similar requirements and would deprive the rail-

roads of the equal protection of the laws in violation of Article I, Section 2 of the Ohio Constitution, and contrary to the Fourteenth Amendment to the Constitution of the United States.

In *State, ex rel.* v. *Brown*, 1 Ohio St. 2d 121, at page 125, the court said:

"Without doubt, the General Assembly has broad powers of classification in legislative enactments. *State, ex rel. Lourin*, v. *Industrial Commission*, 138 Ohio St. 618, 37 N. E. 2d 595.

"The only requirements of the equal protection clauses are that the classification must not be arbitrary or unreasonable and that persons in the same class must be treated substantially alike; but a classification may be discriminatory and still supportable. In *Allied Stokes of Ohio Inc.* v. *Bowers, Tax Commr.*, 358 U. S. 522, 528, 3 L. Ed. 2d 480, 486, 79 S. Ct. 437, 441, it is said:

" '* * * Similarly, it has long been settled that a classification, though discriminatory, is not violative of the equal protection clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. * * *.' "

When the statutes herein are examined in light of these rules, they are not so repugnant to the equal protection clauses as to be invalid.

For their third cause of action the railroads contend that the full crew laws to the extent they require the railroads to employ one fireman on every locomotive of plaintiffs' performing the operations described in said statutes, impose upon the railroads in their railroad operations in interstate and foreign commerce undue and unreasonable burden on interstate and foreign commerce, contrary to Article I, Section 8, Clause 3 of the Constitution of the United States.

Answering a similar attack on the 1907 Arkansas full crew law, the Supreme Court said:

"The statute here involved is not in any proper sense a regulation of interstate commerce * * *. Upon its face, it must be taken as not directed against interstate commerce, but as having been enacted in aid, not in obstruction of such commerce, and for the protection of those engaged in such commerce. * * * Undoubtedly, Congress, in its discretion may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce. But is has

not done so in respect to the number of employees to whom may be committed the actual management of interstate trains of any kind. It has not established any regulations on that subject, and until it does, the statutes of the state, not in their nature arbitrary, and which really relate to the rights and duties of all within the jurisdiction, must control. This principle has been firmly established, and is a most wholesome one under our systems of government, federal and state." (*Chicago, R. I. and P. R. Co.* v. *Arkansas, supra,* 219 U. S. 453, 465, 466.)

The court finds plaintiffs' third cause of action to be without merit. The full crew laws were not an undue and unreasonable burden on foreign or interstate commerce when enacted, and the evidence does not establish that when applied under present conditions, they have any substantial different impact on commerce.

By way of declaratory judgment, the court concludes by way of legislative interpretation that the word "fireman" as used in Sections 4999.07 and 4999.08, Revised Code, require such personnel not only on steam locomotives but also on Diesel electric locomotives. The court further concludes that such legislative requirement cannot be said to bear no real or substantial relationship to the public health, safety or welfare or deprive plaintiffs of their property without due process of law; and cannot be said to be violative of the equal protection clause; and cannot be said to be an undue and unreasonable burden on commerce. Therefore, said statutes are not unconstitutional.

Judgment to such effect is hereby rendered at the costs of the plaintiffs.