CHICAGO & NORTH WESTERN RAILWAY COMPANY and
others, Plaintiffs and Appellants, v. LA FOLLETTE,
individually and as Attorney General, and others,
Defendants and Respondents: BROTHERHOOD OF
LOCOMOTIVE FIREMEN & ENGINEMEN and others,
Intervening Defendants and Respondents.*

*No. 102. Argued May 5, 1969.—Decided July 29, 1969.*
(Also reported in 169 N. W. 2d 441.)

* Motion for rehearing denied, without costs, on October 28, 1969.

632

638

639

640

For the plaintiffs-appellants there were briefs by *Lawton & Cates* and *Richard L. Cates* and *John H. Bowers*, all of Madison, and oral argument by *Richard L. Cates*.

For the defendants-respondents the cause was argued by *Beatrice Lampert*, special counsel, with whom on the brief was *Robert W. Warren*, attorney general.

For the intervening defendants-respondents there was a brief by *Ralph M. Hoyt* of Milwaukee, for the Brotherhood of Locomotive Firemen & Enginemen, and by *Roland B. Day* of Madison, for the Brotherhood of Railroad Trainmen, attorneys, and *Harold C. Heiss* of Cleveland, Ohio, of counsel, and oral argument by *Mr. Hoyt*.

BEILFUSS, J. The issues, broadly stated, are as follows: [3]

(1) Does the required employment of a fireman as a part of a five-man crew in every road freight and yard operation by the plaintiff-railroads deny the railroads due process of law?

(2) Does the required employment of a fireman in a light engine with no cars attached in operation outside yard limits deny the plaintiff-railroads due process of law?

(3) Does the statutory exemption of railroads operating less than 10 miles outside of yard limits deny the plaintiff-railroads equal protection of the laws?

The due process and equal protection challenges to the constitutionality of the questioned statutes rest upon art. XIV, sec. 1 of the United States Constitution, and art. I, secs. 1, 13 and 22 of the Wisconsin Constitution.

Section I of the fourteenth amendment to the United States Constitution provides, in part, as follows:

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." [4]

---

[3] The pleadings set forth another issue, namely: Is the fireman requirement an unconstitutional burden upon interstate commerce? This issue was not briefed nor argued upon appeal. In any event, it has been resolved against the contention of the railroads by the United States Supreme Court in *Engineers v. Chicago, R. I. & P. R. R.* (1966), 382 U. S. 423, 86 Sup. Ct. 594, 15 L. Ed. 2d 501, and *Firemen v. Chicago, R. I. & P. R. R.* (1968), 393 U. S. 129, 89 Sup. Ct. 323, 21 L. Ed. 2d 289.

[4] The Wisconsin constitutional provisions are:

Art. I, sec. 1. "All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

We deem that the constitutional guarantees of individual privileges and the restraints placed upon the legislature are of the same effect in both constitutions in deciding the issues of this case.

In *Haase v. Sawicki* (1963), 20 Wis. 2d 308, 311, 121 N. W. 2d 876, in footnote 2, we stated:

"It is well settled by Wisconsin case law that the various freedoms preserved by sec. 1, art. I, Wis. Const., are substantially the equivalent of the due-process and equal-protection-of-the-laws clauses of the Fourteenth amendment to the United States constitution. *Pauly v. Keebler* (1921), 175 Wis. 428, 185 N. W. 554; *Boden v. Milwaukee* (1959), 8 Wis. (2d) 318, 324, 99 N. W. (2d) 156; and *Lathrop v. Donohue* (1960), 10 Wis. (2d) 230, 235, 102 N. W. (2d) 404."

And in *Boden v. Milwaukee* (1959), 8 Wis. 2d 318, 324, 99 N. W. 2d 156, this court said:

"We are aware of no decision of this court which has determined that sec. 1, art. I of the Wisconsin constitution, imposes any greater restriction on the exercise of the police power than do the due-process and equal-protection-of-the-laws clauses of the Fourteenth amendment."

It is clear that the statutory requirement of a fireman in a train crew is a restraint upon the freedom of the plaintiffs to contract, an interference with the management of their business and, in effect, deprives them of some of their property in violation of the constitutional provisions unless it is done under the police power of the state and by due process of law.

The United States Supreme Court in *Nebbia v. New York* (1934), 291 U. S. 502, 524, 525, 54 Sup. Ct. 505, 78

---

Sec. 13. "The property of no person shall be taken for public use without just compensation therefor."

Sec. 22. "The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."

L. Ed. 940, described police power exercised with due process:[5]

"And Chief Justice TANEY said upon the same subject:
" 'But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same powers; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States.'

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution, the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given. These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.

[5] *Also see Williamson v. Lee Optical Co.* (1955), 348 U. S. 483, 75 Sup. Ct. 461, 99 L. Ed. 563; *Day-Brite Lighting, Inc. v. Missouri* (1952), 342 U. S. 421, 72 Sup. Ct. 405, 96 L. Ed. 469; *Daniel v. Family Ins. Co.* (1949), 336 U. S. 220, 69 Sup. Ct. 550, 93 L. Ed. 632; *Lincoln Union v. Northwestern Co.* (1949), 335 U. S. 525, 69 Sup. Ct. 251, 93 L. Ed. 212; *Olsen v. Nebraska* (1941), 313 U. S. 236, 61 Sup. Ct. 862, 85 L. Ed. 1305; *West Coast Hotel Co. v. Parrish* (1937), 300 U. S. 379, 57 Sup. Ct. 578, 81 L. Ed. 703.

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."

Safety of the public and of the railroad crew are legitimate concerns of the legislature in the exercise of its police power. The legislature can therefore impose upon the railroads minimum crew requirements if the requirements comply with due process.

The railroads contend that to uphold the statutes it must appear that there is (1) a reasonable relationship between the disputed fireman requirement and public safety, and (2) the cost burden imposed upon the railroads is justified in view of the enhanced safety. In effect, the court must balance the gain to the public against the hardship imposed.

The defendants, the state and the brotherhoods, contend the ultimate question is whether the legislative choice is without reasonable basis.

We do not believe the tests of due process as urged by the parties are substantially different. The fireman requirement must make a significant contribution as contrasted to insignificant contribution to safety, and the cost burden cannot be confiscatory or grossly disproportionate to the enhanced safety in order to comply with the requirement of a reasonable basis.

However, the burden imposed upon one challenging the constitutionality of the statute is heavy—the statute

is presumed to be constitutional—the court does not weigh the evidence in the traditional sense but only determines whether there is any reasonable basis for the legislation. The court cannot uphold or strike down legislation upon the basis of its belief that the statute is good or bad, or wise or unwise. If there is any reasonable basis for the exercise of police power by the legislature the court must uphold the right of the legislature to act.

The following Wisconsin citations delineate the scope of the courts' authority to declare a law unconstitutional for want of due process.

In *Chicago & N. W. Ry. v. La Follette, supra,* at page 522, the court, in effect, told the parties how it would review the case:

"We should not lose sight of the function of courts in our society. That a statute will be upheld if there is any reasonable basis for it necessarily implies a determination of that very question, with the proviso that the court will not weigh the evidence."

And, on page 529:

" 'But this challenge against the constitutionality of the Full Crew Act depends entirely on facts. We cannot determine whether the Act is confiscatory, unreasonable and arbitrary, or whether it does not reasonably tend to promote safety, until facts are presented to show the existence of any of these effects. Prima facie, the Act is valid and must be so considered by us until its invalidity appears. Whether the measure promotes safety, or has a tendency to do so, must indubitably turn on facts and circumstances regarding that subject, and the relation which the provisions of the Act bear to safety. An analysis of the statute and the statute's requirements is necessary; we must compare these with the incidents of transportation, including the causes which create the need for safeguards, and the methods now employed to obtain the safety of the public and employees. When the result is reached, if it is found the statutory protection is of such slight consequence, or is so incidental as to cause the provisions of the Act to be wholly impractical,

and not in promotion of the safety it seems to strive for, then its operation would be unreasonable and arbitrary. This situation could only be developed by evidence. In these circumstances, of course, it would be error to refuse to hear evidence. [Cases cited.]' "

In *Clark Oil & Refining Corp. v. Tomah* (1966), 30 Wis. 2d 547, 553, 554, 141 N. W. 2d 299, the court stated:

"The ordinance is presumed constitutional and the attacking party must establish its invalidity beyond a reasonable doubt.

"The ordinance must be sustained if there is any reasonable basis for its enactment, and the courts will only interfere with the exercise of police power by a municipality when it is clearly illegal.

"The function of a reviewing court is solely for the purpose of determining whether legislative action under the power delegated to the municipality passes boundaries of its limitations or exceeds boundaries of reason.

"Is there any rational basis for a legislative choice supporting the ordinance?"

*See also J & N Corp. v. Green Bay* (1965), 28 Wis. 2d 583, 137 N. W. 2d 434; *Courtesy Cab Co. v. Johnson* (1960), 10 Wis. 2d 426, 103 N. W. 2d 17.

In *Borden Co. v. McDowell* (1959), 8 Wis. 2d 246, 257, 258, 99 N. W. 2d 146, the court said:

" 'The reasons for a given statute are for the legislature, if there are any which can fairly have weight. They are not for the courts. The latter have no control over the validity of a law unless they can say with substantial certainty that no argument or consideration of public policy exists which could have weight with any reasonable and honest man. If any such argument or reason can be suggested, its weight or sufficiency is not debatable in the courts. The existence of legitimate and adequate reasons for any law should not lightly be denied. Human minds differ, and what may seem inadequate or irrelevant to one may seem cogent to another. One is not justified, therefore, in assuming that all who differ from him are unreasonable or are not acting in good faith. It is from such considerations as these that the courts have laid down for themselves the rule that only in a clear

case—clear beyond reasonable doubt—will they venture to assert that a law is without reason to support either its purpose or the classifications it may make.' *State ex rel. Kellogg v. Currens* (1901), 111 Wis. 431, 438, 87 N. W. 561.

" 'If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto. The court cannot try the legislature and reverse its decision as to the facts. All facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court.' *State ex rel. Carnation M. P. Co. v. Emery* (1922), 178 Wis. 147, 160, 189 N. W. 564."

We turn now to a consideration of the facts—not to weigh them but to determine whether the legislation is without reasonable basis.

It is apparent, as the railroads assert, that there have been vast changes in the operation of railroads over the past thirty years. The railroad cars are larger and better built, the roadbeds are improved and safer, the traffic control methods and equipment employed by the railroads are vastly improved from the standpoint of safety and efficiency, public crossings are better protected and, most important for this litigation, the railroads have moved from coal burning steam locomotives to diesel powered electrically operated locomotives with a great deal of automatic operation. The fireman no longer spends any of his time and effort in shoveling coal for the boiler fire.

We are aware that railroading is a hazardous business with not infrequent danger to persons and property. We are further aware the danger and safety are relative concepts and that absolute safety can probably never be obtained. Does the presence of a fireman in the train crew make any significant contribution to safety?

We will first consider the crew and particularly the fireman in through freight and way freight operations.

The minimum crew for these operations is established by sec. 192.25 (2), Stats. This statute was held to be constitutional by the trial court. The crew cannot be less than five men and must consist of "an engineer, a fireman, a conductor, and 2 brakemen."

In both types of service three men ride in the lead locomotive, the engineer, the head brakeman and the fireman, and two men ride in the rear or caboose, the conductor and rear brakeman.[6]

The conductor is in charge of the train and gives orders for its movement; he also is concerned with the condition and operation of the equipment, except the locomotive. He keeps a lookout forward for damaged or defective equipment or conditions.

The rear brakeman performs the same lookout function as the conductor on the other side of the train, and makes repairs and corrects unusual conditions that are remedial on the trip.

The engineer rides on the right side of the cab of the lead locomotive and is responsible for the operation of the locomotive. He keeps a lookout on the right side for all railroad traffic signals, for dangerous conditions on or near the track, and looks to the rear when the train is in a right-hand curve to inspect the condition of the train. He also receives and executes train movement signals from the conductor or ground crew.

The cab of a locomotive is so placed and constructed that the engineer does not have a view to the left in most diesel engines now being operated by the railroads.

The head brakeman sits on the left side of the cab. He keeps a lookout in front, to the left, for signals and danger. His principal function, however, is to inspect the train and equipment for any deficiencies or dangers. This requires that he look to the rear. He may and does

---

[6] The job descriptions, as they follow, are generalizations and do not purport to set forth all of the duties of each member of the crew.

leave his position on the left on occasion and exercises his lookout from the right. If he discovers something wrong with the equipment that is correctable en route he will leave the engine cab, and sometimes resumes his position on the train in the caboose. He is not trained in the mechanics or operation of locomotives.

The fireman also sits on the left-hand side in the cab of the lead locomotive. He has the same lookout duties on the left side as the engineer has on the right. He looks for signals, highway and foot crossings, alignment of switches, obstructions and defects in tracks, railroad workers, trespassers, livestock, and railroad equipment.

A great deal of testimony was offered by both sides as to the inspection and maintenance of locomotives done by the fireman. Modern diesel locomotives are complex and firemen are given special training in their operation and repair. There are some mechanical failures and defects which occur en route. Many can be taken care of by the engineer almost automatically; others cannot. In multiple locomotive trains the fireman can and does go from one locomotive to another en route to correct the condition or cut out a faulty engine. While the maintenance function of a fireman may or may not make a substantial contribution to the maintenance of equipment and the efficiency of the operation of the train, we believe it has little to do with either safety to the public or to the train crew.

Another duty performed by the fireman is to relieve the engineer. If an engineer dies, is ill, or incapacitated by fatigue or otherwise, the fireman can assume his duties. Because of the automation of diesel engines and favorable working hours and conditions of the engineers, the railroads contend this function is not at all frequent and makes very little contribution to safety.

As stated above, we do not pass upon the weight of the facts in a constitutional review but only determine

whether a fact or facts can be a reasonable basis for the exercise of police power. We are of the opinion that the lookout, signal passing and engineer relief duties of the fireman for inroad service of freight trains could be accepted by the legislature as having a significant or substantial relation to the objective sought, namely, railroad safety for the public and the crew.

We must now be concerned with the burden imposed upon the railroads in comparison to the increased safety achieved.

Again the record contains much testimony and other evidence as to increased safety provided by the fireman. The plaintiff-railroads produced statistics to show the accident rate in states without full-crew laws was no higher than the few full-crew states. The defendants disputed the bases of the plaintiffs' statistics and offered evidence to refute them. Some degree of safety is offered by the presence of a fireman; it is for the legislature to weigh the facts to determine whether the amount of increased safety justifies the requirement.

The financial burden upon the plaintiff-railroads because of the Wisconsin full-crew fireman requirement is substantial. The eight plaintiff-railroads have shown that their cost for firemen in freight operations exceeds $6,000,000 per year. They claim these costs are unjustifiable if not confiscatory; that they are being placed in an unfavorable competitive position with other forms of transportation and that funds which could be used to improve the quality and efficiency of their equipment and operations are being denied to them, to the detriment of the public.

The defendants counter these claims and arguments by contending that the overall cost of a fireman does not represent the true net cost of the fireman requirement. Their contentions are that some firemen would have to be retained; engineers under collective bargaining

agreements would receive additional wages; additional sums would be spent for training of engineers;[7] extra engineers would have to be paid for extra and seasonal work; and other or additional crewmen would have to be paid for the maintenance work done by the firemen.

As was stated in *Firemen v. Chicago, R. I. & P. R. R.,* *supra,* the record contains no meaningful estimate of what this cost actually is. We cannot, upon this record, conclude the cost is arbitrary, confiscatory or unreasonably burdensome in view of the objective sought.

We agree with the trial court that sec. 192.25 (2), Stats., which requires a fireman in the five-man crew inroad or outside of yard freight service, is constitutional.

We also agree with the trial court that sec. 192.25 (4), Stats., which provides for a three-man crew in a single engine operating outside yard limits, is unconstitutional.

The state requires a crew consisting of an engineer, a fireman, and a pilot who shall have had no less than three years' experience in train or engine service, passed standard examinations, and qualified as an engineer or conductor.

The defendant-attorney general claims the constitutionality of this statute was not at issue and therefore not in the case. An examination of the pleadings clearly shows a challenge to the statute to be at issue.

Proof in the record specifically directed to this statute is either nonexistent or meager. However, proof in the record is substantial as to the functions performed by the crew in the cab of a locomotive. The real point is that the duties of the crew in a cab operating a single locomotive, without cars attached, are such that, based upon safety considerations, a three-man crew cannot be justified.

---

[7] Presently engineers are firemen for at least three years and then are given examinations on mechanical aspects of locomotives and engineers' duties.

The trial court determined that sec. 192.25 (4a), Stats., which requires a five-man crew for switching operations, was not a constitutional exercise of the police power.

We disagree. We are of the opinion that the increased safety afforded by a fireman in a switch engine crew is a sufficient basis for the statute to withstand a challenge on the ground of lack of due process.

The statutory switch engine crew consists of an engineer, a fireman, a conductor and two helpers. A switch engine crew operates within the limits or near limits of the yard. It moves single cars or several cars to various locations or tracks in the yard. It delivers and picks up cars on commercial sidings and moves cars in or out for the freight train makeup.

During these operations there are only two men in the cab of the locomotive—the engineer and the fireman. The conductor and the two helpers, whether they be flagmen, switchmen or others, are on the ground attending to their various duties.

It is true, switch engines run slowly, for short distances, with few cars attached. They can be stopped relatively quickly and most engines have a deadman control.[8]

Again the engineer cannot see on the left side and the fireman cannot see on the right side. There is, of necessity, much movement in stopping, starting, changing directions and speeds. The engine is not to be moved except upon signal by a member of the ground crew. If the crewman passes out of sight of the engineer or fireman, the engine must stop.

The record clearly shows that there are many potential dangers in yard switching operations. There are busy highway crossings in many municipalities, with pedes-

---

[8] A "deadman control" is an automatic device to stop the engine when the engine operator's foot no longer depresses a pedal provided.

trians as well as vehicles. There are other railroad employees, employees of commercial ventures on railroad sidings, deliverymen and train passengers in the immediate vicinity of switching operations.

The ground crew, of course, must be concerned with the safety of these persons but the fact remains that it is only the fireman who can see what is transpiring on the immediate left side of the engine, relay the ground crew signal, and inform the engineer of danger. Notwithstanding evidence as to radio communication, crewmen signal triangulation, and roundtable turning of the engine, we believe the potential hazards existing and the increased safety provided by the fireman are sufficient constitutional bases for the statute and hold that sec. 192.25 (4a) is constitutional.

The trial court was of the belief that the lookout and signal passing functions of the fireman in switching operations did not justify the cost of the fireman. The annual cost to the plaintiff-railroads was estimated at $3,000,000 per year. We are impressed with the safety afforded by the fireman or second man in the engine in switching operations, and for the reasons discussed in connection with inroad service cannot set aside the legislative determination because of the financial burden to the plaintiffs.

The trial court was of the further opinion that because sec. 192.26, Stats., gives to the Public Service Commission the right and duty to fix reasonable conditions pertaining to or affecting switching crews in yard operations, it supersedes sec. 192.25 (4a). As a matter of statutory construction, we do not believe that sec. 192.26 supersedes sec. 192.25 (4a). The legislature, by giving a regulatory agency some authority, has not foreclosed itself from acting directly. Sec. 192.25 (4a) makes a specific provision; sec. 192.26 makes a general provision,

and the authority given to the Public Service Commission can be exercised provided it does not conflict with sec. 192.25 (4a).

The plaintiff-railroads also contend that they are denied equal protection of the laws by a statute which exempts railroads that operate less than 10 miles of route outside of yard limits.

The evidence reveals there are several (perhaps six or seven) private industries in the state which own and operate their own locomotive or locomotives for the purpose of moving, loading and unloading incoming and outgoing freight cars. Some of those industries may own some of their own freight cars but the great majority are owned by the plaintiffs and other railroads. These locomotives are admittedly operated with a smaller crew than required statutorily of the plaintiffs.

A like contention was made by the railroads in the federal courts where several interstate railroads were challenging the Arkansas full-crew law upon the ground of unequal protection. (The Arkansas statute exempts railroads with less than 50 miles of track.) The United States Supreme Court in *Engineers v. Chicago, R. I. & P. R. R., supra,* at pp. 437, 438, states:

"It is impossible for us to say as a matter of law that this difference in treatment by the State, based on the differing mileage of railroads, is without any rational basis as the railroads contend. Certainly some regulations based on different mileage of railroads might be wholly rational, reasonable, and desirable. We cannot say on the record now before us that classification according to the length of mileage in these two statutes constitutes discrimination against interstate commerce in violation of the Commerce Clause or the Equal Protection Clause. See *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U. S. 132, 137."

In our 10-mile limitation we believe the classification is germane for the purpose sought to be achieved

(safety), and the classification distinctive and meaningful,[9] and as such a legitimate exercise of the police power.

The record reveals that the operation of engines by industries is usually limited to their own property and not in various railroad yards or over city streets; that it involves only the industry's own freight and not property of others; and that the engines are smaller and the work done not as complex.

We, too, cannot say, as a matter of law, that the classification is not germane nor based upon real and adequate distinctions so as to constitute constitutionally prohibited unequal protection of the laws.

We recognize this opinion is long and perhaps tedious, nevertheless we feel it is appropriate to make an additional observation.

The question of the size and composition of railroad crews and statutory full-crew laws has been, for many years, the subject of extensive and sometimes bitter collective bargaining conflicts and litigation. Some states have never had full-crew laws; in several states the legislature has either amended or repealed the full-crew law; in one state, Washington, the people, by direct vote, repealed it; only nine states now have full-crew laws (and possibly enforced in only seven), and none of the states bordering Wisconsin have full-crew laws.

In addition, because of an apparent breakdown in collective bargaining and an almost imminent nationwide strike, the Congress, in 1965, enacted a law which provided for compulsory arbitration. The findings and recommendations of the arbitrators were to be binding and effective for a period of two years. The arbitrators found that 80 percent of the firemen on diesel locomotives could be phased out.

[9] *See Brennan v. Milwaukee* (1953), 265 Wis. 52, 60 N. W. 2d 704.

This finding in no way supersedes our statute and is not binding upon our legislature,[10] but this finding, together with the experiences of other states, might well be sufficient cause for our legislature to re-evaluate our full-crew law.

At this point it should be pointed out, however, that in recent litigation the courts of last resort in New York,[11] Indiana,[12] Ohio,[13] and the United States Supreme Court [14] (Arkansas statute), similar full-crew laws have been upheld as being constitutional.

The history of our own statute reveals it was enacted in 1907. Then, and until the amendment of 1959, the fireman requirement applied to steam powered locomotives. The 1959 amendment applies to all locomotives "propelled by any form of energy."

This amendment passed both houses of the legislature in both 1955 and 1957, but was vetoed by the then governors. In 1959 the bill again passed and was reluctantly signed by the governor. Governor Nelson did state: "The whole question of technical safety regulation of our public transportation is beyond the competence of the legislature. The legislature should set broad policy as to safety, but the execution of it should be in the hands of a regulatory body, *i.e.*, the Public Service Commission."

---

[10] *See Firemen v. Chicago, R. I. & P. R. R., supra.*

[11] *New York Central R. R. v. Lefkowitz* (1965), 46 Misc. 2d 68, 259 N. Y. Supp. 2d 76, affirmed 28 App. Div. 2d 735 (1967), and affirmed Court of Appeals (1968), 23 N. Y. 2d 1, 241 N. E. 2d 730.

[12] *Public Service Comm. v. New York Central R. R.* (1966), 247 Ind. 411, 216 N. E. 2d 716, certiorari denied, 385 U. S. 843, 87 Sup. Ct. 90, 17 L. Ed. 2d 76.

[13] *Akron, Canton & Youngstown R. R. v. Public Utilities Comm.* (1967), 9 Ohio Misc. 183, 224 N. E. 2d 169, affirmed Court of Appeals (1968).

[14] *Firemen v. Chicago, R. I. & P. R. R., supra.*

In the late 1930's, diesel powered locomotives began to appear. The size, the power, the efficiency and automation and safety of diesel locomotives have steadily increased until the latest models have most of their machinery self-contained and in sealed units, with the operation very nearly automatic. However, many of the older or early models requiring much more en route care and maintenance are still in use. The fireman no longer fires the boiler—he is free to devote his time to maintenance, lookout, and signal passing.

Assuming that at specific times, at specific locations, it could be demonstrated that a fireman makes little or no contribution to safety, that fact would not compel a holding that the statute is unconstitutional. The application of the statute to specific operations might be unconstitutional but the challenge here is to the statute as a whole. The fireman requirement applied to railroad operations as a whole does enhance safety to a sufficient degree to permit the legislature to require it.

We join the trial court in suggesting it would be well for the legislature to again review the full-crew requirements in view of the increased efficiency and safety of modern railroad equipment and methods. If in the future it can be demonstrated that the fireman requirement is only an employment statute, with no reasonable relation to safety, the statute cannot pass as a constitutional exercise of the sovereign police power for safety of the state's citizens. If it affords safety in some instances and not others, perhaps it could be amended or the authority delegated to a regulatory body.

In holding the Wisconsin full-crew law constitutional (except sec. 192.25 (4), Stats.), we do not determine whether it is good law or a bad one—we hold only that it is constitutionally permissible—the weighing of the cogent factors and the wisdom of the statute is for the legislature.

*By the Court.*—Judgment affirmed in part and reversed in part. No costs to be taxed.

HANLEY, J. (*dissenting*). I repectfully dissent from the decision of the court. The majority are of the opinion that the lookout, signal-passing, and engineer relief duties of the firemen for inroad service of freight trains could be accepted by the legislature as having a significant or substantial relation to the objective sought, namely, railroad safety for the public and the crew. I disagree. In matters of public safety, as in other social relationships, there is such a thing as a law of diminishing returns.

While we should not permit a public carrier to fail or refuse to take every reasonable precaution to protect the public, there is a line of demarcation between reasonable and unreasonable requirements.

Here we are dealing with comparative safety, not absolute safety. Comparative safety is necessarily attended by factors of disadvantage which must be considered in the comparison. One of these factors is cost.

The cost of complying with state laws enacted to promote safety is an important element in determining whether the law is arbitrary and unreasonable. *Missouri Pacific R. R. v. Norwood* (1931), 283 U. S. 249, 255, 51 Sup. Ct. 458, 75 L. Ed. 1010. The evidence discloses that it will cost the appellants in excess of $6,000,000 annually to comply with the provisions of this act in the state.

I think that this speculative advantage to safety through the retention of a fireman on a modern-day diesel car is so highly problematical and uncertain that the expenditure of this sum annually for that purpose out of the annual income for the Wisconsin area is unreasonable and arbitrary.

This is especially true where the industry is being subsidized by annual congressional appropriations granted pursuant to the Railroad Retirement Act.

Assuming the present firemen's duties to be desirable in the interest of public safety, it does not appear from

the record that a separate crew member is at all necessary to their performance. From my view of the testimony it would appear clear that such duties could be assumed by the conductor or head brakeman or shared between them.

In my opinion the trial court was correct in referring to the statutes in question when he stated in his opinion:

"They are essentially job statutes, rather than safety measures as was originally intended."

However, the trial court drew a contrary conclusion and, in my view, inconsistent and erroneous.

I would hold sec. 192.25 (2), Stats., invalid and unconstitutional as an unreasonable and unlawful exercise of the police power and reverse that part of the judgment. I would affirm that part of the judgment which holds secs. 192.25 (4) and 192.25 (4a) unconstitutional and void.