METROPOLITAN TRANSPORTATION AUTHORITY, Plaintiff, *v.* CITY OF NEW YORK, Defendant.

First Department, June 17, 1969.

*John R. Hupper* of counsel (*Bruce Bromley, Robert S. Rifkind* and *James C. Hansen* with him on the brief; *Cravath, Swaine & Moore,* attorneys), for plaintiff.

*Alfred Weinstein* of counsel (*Stanley Buchsbaum* with him on the brief; *J. Lee Rankin, Corporation Counsel,* attorney), for defendant.

*Per Curiam.* We have before us a submission of a controversy on an agreed statement of facts pursuant to CPLR 3222. The controversy involves the contribution required to be made by defendant city to plaintiff pursuant to section 1277 of the Public Authorities Law. This statute makes the total cost to the plaintiff of the " operation, maintenance and use " of each passenger station of any railroad facility within the city a charge to be borne by the city. Pursuant to the statute plaintiff has certified such cost and the city objects to several items. These lend themselves to ready classification.

The first objection is to the inclusion of the expenses of three stations: Penn Station, Jamaica and Flatbush. As to the latter two, it is contended that these are not true passenger stations in the sense that the public does not use them as starting or finishing points but merely to change trains, and as to all three that it was never the intention of the Legislature that they be included. This contention is not supported by any direct evidence of legislative intent but rests on prior enactments, estimates of the cost involved as calculated by plaintiff, and other observations by persons and bodies interested. Against this is the undoubted fact that this statute was enacted because the prior and then existing measures for the relief of the Long

Island Rail Road had proved inadequate, and the extent of assistance from public funds was intended to be increased. We can find no justification for interpreting the words "passenger station" to mean anything less than stations intended to be used in the passenger service of the road for the accommodation of passengers. And this use is not disputed.

The second objection deals with several items which defendant claims are not properly classified as items of maintenance and operation of the stations, as distinct from operation and maintenance of the railroad itself. As a philosophical, or even a semantic, question, it is difficult to distinguish, as between certain functions, whether they are operations of the railroad or of the stations. All are performed for the passengers. The Authority takes the position that all operations performed within or in connection with the stations are embraced by the statutory words. Defendant city takes the position that only the physical upkeep of the stations is included. We believe that "operations" include the services of those employees whose work is in connection with the use of the stations by passengers, even though this necessarily has a relationship with the passengers' use of the railroad; and furthermore, that a purely railroad activity, though it may be conducted in a station, is not within the statutory intent.

There are 10 such items in dispute. Five of these are the salaries of various types of employees. Some of these, such as redcaps and baggagemen, perform services exclusively for passengers in the stations and would clearly come within the meaning of station operation. Others have duties which, while not so free from possible argument, do refer to service to the passenger within the station but have a more intimate connection with his use of the trains. Such services are the announcement of trains, posting signs as to departures and arrivals, dispensing timetables, selling tickets, and the like. We believe that those services also are what was meant by station operation in that they are a vital part of having a station at all instead of a mere platform for the receipt and discharge of train riders. As to stationmasters, the great bulk of their duties as set out in the agreed statement of facts has to do with station operation. Some part of their duties, such as tentative schedule changes and the occasional duties with regard to train crews, are railroad operations. No attempt was made to allot the salaries paid on a time or other basis. As the railroad duties apparently were by far the lesser part of the duties performed, we find that these services were also properly charged to station operation.

Certain expenses, we find, are not properly so classified. These are the salaries of the train directors and the interlockers. The interlockers move trains from one track to another. The train directors arrange for the positioning of trains and direct the interlocker operators accordingly. Undoubtedly this is a railroad operation, though indisputably increased by the existence of the station at the particular point. In the usual understanding, such operations would not be included in the operation of the station.

Neither, we believe, would be the cost of ticket printing. While printing is done at the three stations, the tickets printed are for the entire road and the use is for the actual transportation. The work could be carried on anywhere and has no bearing on the operation of the station. This charge should be disallowed.

The item for track cleaning is properly an item of station maintenance, as the tracks in question are wholly within the stations, and the debris removed is what is dropped by passengers on the platforms.

The last item is that for maintaining a central telephone bureau. The bureau answers inquiries as to arrival and departure of trains, articles lost and found, and the like. While the bureau serves the entire road, the expense is allocated according to the place of origin of the call. Prior to installation of the bureau, calls were handled by station personnel, and would undoubtedly be considered a station service. There is no objection to the method of allocating the expense. Under those circumstances, we deem it a proper charge for station operation.

Defendant city also objects to the inclusion in the account of certain expenses for the 11-day period January 20 to January 31, 1966. The items in question amount to the difference between what the city is liable for under the statute (§ 1277) and what it would have been liable for pursuant to the contract in effect January 20 and expiring January 31. Concededly, section 1277, enacted in May, 1966, by its terms is retroactive to January 20. The city nevertheless claims that there were other purposes besides the changes in extent of the city's responsibility which induced the Legislature to make the statute retroactive. This being undoubtedly true, the city argues that had the Legislature intended to abrogate the contract it would have said so. We cannot accept the argument. Actually the contract was not abrogated in the sense that would render the statute unconstitutional, and the city does not so claim. As to legislative intent, in the single instance called to our attention where the Legislature intended to defer an increase in the burden of a subdivision

until expiration of an existing contract, it specifically provided for the statutory obligation to begin on the day following expiration of the contract (see L. 1963, ch. 606, §§ 4, 5). Had the Legislature so intended here it would doubtless have made similar provision.

. Lastly, the city claims it should receive as a credit the revenue derived from concession rentals and redcap revenues. The Authority resists the claim on the ground that the statute provides for cost and not " net " cost. We believe the city's position is well taken. In providing for relief of the road from the cost of operating the stations, it was undoubtedly the Legislature's intent that the actual burden rather than an accounting figure should constitute the measure of relief. When this burden is reduced by the operation of the station, the reduction should be given effect.

Submit judgment accordingly.

STEVENS, P. J., EAGER, TILZER, McGIVERN and STEUER, JJ., concur,

Submit judgment in accordance with opinion *Per Curiam*.