OPINION OF THE COURT
Albert M. Rosenblatt, J.
In this CPLR article 78 proceeding, petitioners challenge the legality of certain amounts charged by respondent Metropolitan Transportation Authority (MTA) in its annual billing to Dutchess County, pursuant to Public Authorities Law § 1277, for the fiscal year covering April 1, 1984-March 31, 1985. The petition alleges improper or excess billings by MTA in the total sum of $420,083, which was part of a $966,624 billing, $545,076 of which petitioners had not disputed. The disputed amount as alleged in the petition comprises $235,379 paid by MTA and billed to petitioners representing the settlement, by MTA, of a wrongful death action brought by a decedent’s estate against Conrail; $15,760 representing certain snow removal costs; $105,950 for additional snow removal costs, and $64,459 representing certain miscellaneous costs. The original disputed amount was $421,548, but MTA deducted $1,465 thus bringing the disputed total to $420,083 as alleged in the petition.
By notice dated August 23, 1985 petitioner challenged some of the costs because of MTA’s failure to furnish detailed information as to computations. Six months after petitioner’s initial protest, MTA furnished documentation and the parties stipulated that the petitioner would pay an additional $132,444, thus leaving, for judicial adjudication, the disputed billing sum of $287,639, representing $52,260 for certain snow removal costs, and $235,379 for settlement of the wrongful death action.
The parties have focused on whether the disputed charges are costs occasioned by the operation, maintenance, or use of the Poughkeepsie railroad station, as the respondent argues, or costs referable to the operation of the railroad, as asserted by petitioners. While the issues have been well and suitably sharpened in the context of the station versus railroad formu *594 lation, proper analysis suggests resort to legislative purposes and history.
Public Authorities Law § 1277 reads as follows, in pertinent part:
"§ 1277. Station operation and maintenance
"The operation, maintenance and use of passenger stations shall be public purposes of the city of New York and the counties within the district. The total cost to the authority and each of its subsidiary corporations of operation, maintenance and use of each passenger station within the district serviced by one or more railroad facilities of the authority or of such subsidiary corporation, including the buildings, appurtenances, platforms, lands and approaches incidental or adjacent thereto, shall be borne by the city of New York if such station is located in such city or, if not located in such city, by such county within the district in which such station is located. On or before June first of each year, the authority shall determine and certify to the city of New York and to each such county the total cost to the authority and its subsidiary corporations, for the twelve-month period ending the preceding March thirty-first, of operation, maintenance and use of each such passenger station within such city and each such county, respectively.”
In 1965 the Legislature declared the relevant statutory purpose to be the "preservation, strengthening and improvement of commuter services” through the cooperation of the State and its political subdivisions (L 1965, ch 324, § 1 [8]). The objective was to create an authority to deal with financial, managerial, and operational issues in connection with the rail services in New York City, as well as the Counties of Dutchess, Nassau, Orange, Putnam, Rockland and Westchester (L 1965, ch 324, § 3).[1]
Through several changes in some of MTA’s functions and *595 powers (e.g., L 1965, ch 634; L 1979, ch 275; L 1983, ch 838; L 1984, ch 988), the basic objectives and allocations of responsibilities vis-á-vis the municipalities have remained the same.
Pursuant to the legislative scheme, the MTA certifies to the municipalities the respective cost for the operation, maintenance and use of the passenger stations. There is no question raised here as to the constitutionality of the certification procedure itself. The certification process is a valid legislative device, and even empowers the State to withhold from municipalities amounts representing any municipal recalcitrance to pay. This court finds no fault with that device; indeed, it was attacked, unsuccessfully, by Nassau County which claimed that MTA’s power to certify was tantamount to an unlawful power to tax.[2] The certification process does not leave the municipalities without a remedy, they may challenge the propriety of certifications and gain remissions if appropriate (Metropolitan Transp. Auth. v City of New York, 32 AD2d 197, mod 26 NY2d 817).
As for MTA’s expenditure for snow removal, the county concedes all but $52,260 of a substantially higher certification. The amounts were expended by MTA, under contractual arrangements with private snowplow operators through a bidding process. The county questions the 300% rise in cost, the propriety of certain expenditures, and the allocation of the entire cost to station as opposed to railroad matters.
The wrongful death settlement is different. Unlike the snow removal costs, it does not represent a transaction solely between MTA and a third person. The wrongful death action was brought by a plaintiff’s estate against Conrail. The plaintiff named no other party, and in its complaint ascribed acts of negligence to Conrail and its employees, committed on August 8, 1980.
Conrail was relieved of its operations in 1982 (45 USC § 744 [a]) and by agreement between MTA and Conrail, MTA was required to reimburse Conrail for tort claim payments to passengers killed or injured by Conrail operations.
SNOW REMOVAL AND FUEL
Petitioner had challenged the fuel costs, asserting that *596 despite requests, the MTA "has never furnished data that would provide an audit 'trail’ to determine how much fuel was delivered for station heating as opposed to heating railroad cars.” Following the commencement of this suit, the information was apparently furnished, and petitioner has stipulated to withdraw its challenge along those lines so that in the maintenance area it limits its protest to certain snow removal charges.
MTA has, correctly in this court’s view, considered snow removal as an integral part of station maintenance (Metropolitan Transp. Auth. v County of Nassau, 35 AD2d 739, affd 28 NY2d 385). As for the specific expenditures, the petitioner has alleged that it has identified "eight instances when there was either no accumulation or so little that it is impossible to justify such activity”, and, further, that the snow removal contracts were not bid on or advertised, and were otherwise awarded unwisely and with geographical impracticality. MTA’s response is that snow removal is necessary on days "other than those with actual snowfall” and that the contracts were let after "the bid was sent to a total of 49 firms, at least seven of which were located in Dutchess and Putnam Counties”, and that "five of seven local bidders declined to bid. The other two bid, but withdrew their bids before the award was made”.
There is no allegation or authority for the proposition that the snow removal contracts must be competitively bid, under State law. Pursuant to the internal "Operating Procedure”, the required bidding provisions were followed by the placement of ads. Moreover, the court cannot say that it was arbitrary or improper for MTA to include the Poughkeepsie station within a larger bidding area. While separate station bids might theoretically result in lower cost certification per municipality, the potential administrative burdens of such a contractual scheme — for 118 stations — refute any claim that the MTA acted arbitrarily or even unwisely, and may even suggest that the practice employed is ultimately cheaper. The issue might be resolved by a painstaking cost accounting analysis but for article 78 purposes, we need only hold, under long-established principles, that bidding and contractual practices will not be judicially condemned where they have a rational basis (Matter of Brereton & Assoc. v Regan, 60 NY2d 807).
As for the use of some parking spaces by railroad employees such as track crews, MTA has claimed, and it is not disputed, *597 that these crews are used for "station maintenance, such as roof and door repair, and painting, building, and steel structures”. Moreover, passengers often use those spaces for pick up. Under the circumstances, the cost is not certified on an irrational or arbitrary basis (Metropolitan Transp. Auth. v City of New York, 39 NY2d 953).
The wrongful death settlement paid by MTA for Conrail’s negligence and certified as a charge to petitioner also involves a determination as to whether the cost properly falls within the ambit of railroad or station function.
i
THE ACCIDENT, AS A RESULT OF RAILROAD OPERATIONS
According to the MTA, the decedent was not killed while disembarking with the other passengers, who had all detrained at the regular platform stop, at track No. 2. After they did so, the train proceeded to conduct certain "yard movements”, and went into a reverse (southbound) move, in order to enter another track, for a return trip to New York City. While proceeding on this other track (No. 4), the dispatcher, by radio, directed the movement which resulted in decedent’s death. Whether decedent had or had not reboarded the train before disembarking during this switching movement — there is uncertainty as to this — he was undisputedly killed during the switching operation.
Without doubt, he was killed during railroad functions involving train directing, interlocking, and dispatch procedures "after the train was moved outside the station to be switched to another track”. That the passenger may have tried to disembark when the train was passing another platform does not make it any less a railroad switching operation, involving direct actions by Conrail conductors, interlockers, train directors and dispatchers.
The plaintiff in the Conrail suit did not claim any defect in the platform, and made no claim concerning that station, its solidity, state of slipperiness or repair. Nor did plaintiff claim that the space between the train and the platform was deficient. Plaintiff directly blamed the Conrail employees for improper operation of a train which, we observe, was engaging in a track changing maneuver conducted following the regular passenger stop. The pertinent paragraph in plaintiff’s complaint reads as follows: "9. That at all times herein after *598 mentioned, the defendant, conrail, operated, managed and controlled the conrail trains which transported passengers to and from the Railroad Station in Poughkeepsie, County of Dutchess, State of New York.”
The plaintiff charged Conrail with negligence in failing to inspect the cars and secure the doors, and in allowing plaintiff to disembark under hazardous conditions, and related acts of negligence.
The Conrail claim agent also stated that the accident occurred when a Conrail crew, consisting of an engineer, fireman, commander, and two assistant conductors were involved, and that a dispatcher ordered "a reverse move” with "the power on track #6 to track #4”. The MTA account, taken from Conrail, when read together with the complaint, establishes that the deceased was decapitated while the railroad train, being operated after a reverse move, was conducting railroad switching and interlocking type operations, whether they be characterized as "yard movements or not.[3] Presumably, the defense paid $235,379 in settlement under the belief that the Conrail, in performing these operations, was cast in liability for negligence.[4]
*599 II
NATURE OF RAILROAD OPERATIONS AS EXPLAINED LEGISLATIVELY, AND IN METROPOLITAN TRANSP. AUTH. V CITY OF NEW YORK
The purpose of interlocker, train director, dispatcher, and switching operations is to accommodate the existence of multiple platforms, so that passengers may assemble for different destinations. The Poughkeepsie train station has six platforms. The subject of train directors, interlockers, and switching was discussed in Metropolitan Transp. Auth. v City of New York (supra). While the decision mentions them, the briefs and record on appeal are more detailed in describing their purposes.
The following appears in the record on appeal’s agreed statement of facts (p 18) before the Appellate Division:
"35. MTA certified to the City the cost of operating, maintaining and using certain interlockers. An interlocker consists of the facilities required to enable a train to move from one track to another in a location where several tracks are available for handling trains in a given direction. The interlockers involved in this dispute are used to determine the particular station platform and track at which each train will arrive or from which it will depart at those stations where there are multiple platforms because of the volume of passengers and train traffic.
"36. The interlocker facilities include towers, switches, traffic signals, control mechanisms and facilities for communication with dispatchers, station masters and other towers. The control mechanisms coordinate switches and signals and insure that two trains will not be moved to the same track at the same time. Interlocker personnel record the passage of trains and report such passage to the next interlocker and to the Movement Bureau. Where alternatives exist, they also control train routing between the main line track and the *600 designated track and station platform. Trains do not leave the station until the proper signal is displayed by the interlocker personnel. Of necessity, where interlockers are used to control station arrivals and departures and platform and track positioning, the switches they control must extend for a considerable distance beyond the station platform area, that distance being a function of the length of the train, the number of platforms, the number and place of convergence of incoming and outgoing tracks, etc.” (Emphasis added.)
As for train directors, the agreed statement (p 21) has it that they are "personnel who oversee the movement of trains at the station platform, and, thus, coordinate the activities of the various interlockers. ” In the above case the MTA certified these train director costs to the City of New York. It was held to be an improper charge.
Pursuant to the judgment of the Appellate Division (32 AD2d 197, supra), the costs of interlockers and train directors were held to be "not part of the total cost of the 'operation, maintenance and use’ of passenger stations within the meaning of § 1277 of the Public Authorities Law and are not properly chargeable to the City of New York.” (Record on appeal [26 NY2d 817, supra], pp 36-37.)
The following Appellate Division conclusion (32 AD2d, at p 200), was affirmed by the Court of Appeals: "The interlockers move trains from one track to another. The train directors arrange for the positioning of trains and direct the interlocker operators accordingly. Undoubtedly this is a railroad operation, though indisputedly increased by the existence of the station at the particular point” (emphasis added).
"OPERATION, MAINTENANCE AND USE” OF THE STATION
The MTA argues that these words authorize the certification of costs to the municipality because the accident took place within the station boundaries. The MTA has pressed the trilogy of words "operation, maintenance and use”, asserting that if maintenance alone were intended, the Legislature would not have added the other two words, and that by adding them, it intended to embrace an occurrence or accident which involves passenger use of the station, regardless of the cause.
We have guidance. Examining the evolution of the relevant phrase, we will analyze the MTA’s contention in its strongest *601 possible light. Laws of 1961 (ch 201)[5] speaks of "operation and maintenance”, while the instant statute, derived from Laws of 1965 (ch 324) speaks of "operation, maintenance and use”. This very distinction, however, was noted by MTA in its 1969 brief to the Appellate Division (32 AD2d 197, supra), when it then argued unsuccessfully — as it does now — that the words should be construed to include train director and interlocker operations, because costs "would not have been incurred” but for the existence of the stations. The Appellate Division rejected the proposal for obvious reasons. If the test is whether no cost would be incurred but for the existence of a station, as MTA argued then and now, the municipalities would be responsible for the cost of running the entire railroad, considering that commuter railroads use stations. Obviously, the MTA interpretation must be again rejected. In this context there is no added significance to the word "use”.[6]
The MTA then raised the same points in the Court of Appeals asserting that train directors and interlockers are integral to the station’s operation and use, stressing their relationship to passengers (record on appeal, MTA brief, p 42, 26 NY2d 817) they argued:
"Multiple platform stations simply cannot be operated without one or more interlockers which permit the placement of trains from the main line at one or another of the platforms. *602 To the extent that interlockers perform that function we submit that they are clearly a part of the total cost of operation, maintenance and use of passenger stations, 'including the buildings, appurtenances, platforms, lands and approaches incidental or adjacent thereto’, certifiable under Section 1277.
"Train directors are essential to coordinate the activities of the several Penn Station interlockers (21). The necessity for employing them results solely from the fact that Penn Station is a busy, large, multi-platform station. It is clear, therefore, that the cost of train directors, as well as the cost of interlockers, is part of the total cost of operation, maintenance and use of the passenger stations. At the very least, MTA had a rational basis for certifying such costs to the City.”
Considering that the above classification was rejected, MTA may fare no better here. The Poughkeepsie train station of course has multiple platforms, multiple tracks, dispatchers, interlockers, and train directors, and it was during just such a railroad operation that the accident (and allegations of Conrail’s negligence) resulted.
The Appellate Division (32 AD2d 197, supra) necessarily considered stations to include appurtenant yards and tracks, so that MTA is correct in asserting that the accident took place within the station. Indeed, the yard operation included the very station platform where the accident occurred. MTA is obviously incorrect, however, in contending that railroad procedures are transformed into "station” matters merely because they are conducted within stations. This is evident not only from the above-quoted decisional law, but from legislative history.
The Legislature, under Laws of 1961 (ch 201, § 1), enacted County Law § 850 and General City Law § 21-c, enabling counties and cities to contract with railroads which would maintain and operate stations, and to reimburse the railroads for such costs (General City Law § 21-c [2]; County Law former § 850). Passenger "station” was defined to include "buildings, appurtenances, platforms, land and approaches incidental or adjacent thereto” (General City Law § 21-c [1]; County Law former § 850 [l]).[7] It is no coincidence that the Legislature, four years later, in enacting Public Authorities Law § 1277 *603 used the very same language in defining passenger stations for purposes of reimbursement to the MTA. It is clear, therefore, that the Legislature was acting out of a well-established statutory and historical meaning. Notwithstanding the broadest possible definition of "station”, the Legislature clearly imposed on the railroads the responsibility: "for all railroad operations and the maintenance and upkeep of all tracks, rights-of-way, yard facilities, signalling devices * * * and facilities used by such railroad in its railroad operation” (L 1961, ch 201, § 2; County Law former § 850 [1] [c]; emphasis added).
Thus, the Legislature has consistently defined passenger "stations” to include precisely the same components, in identical words, from Laws of 1961 (ch 201) to Laws of 1963 (ch 606) to the creation of the MCTA (L 1965, ch 324) to the subject MTA statute (L 1967, ch 717). This charted course is important, in that it serves to form a clear basis to distinguish between railroad operations and station matters in the context of Public Authorities Law § 1277.[8]
When, on cross appeal, the case reached the Court of Appeals, the issues included, inter alia, the certification of costs for train directors and interlockers.[9] The Court of Appeals in 26 NY2d 817, modified 32 AD2d 197, but sustained the Appellate Division’s conclusion that the MTA improperly certified to the municipality the costs for interlockers and train directors. Although at bar the MTA is not certifying the *604 costs of these functions, per se, their nature, as being purely railroad operations rather than station matters, has been identified by the State’s highest court, and is directly relevant to the instant dispute. That they are properly so classified is evident not only from the above case, but from other indications as well, including the Railroad Law.[10]
As a final observation, we note that neither side discussed the concept of certification of costs by MTA, owing to MTA’s assumption of Conrail’s financial responsibilities (45 USC § 744 [a]).[11] The parties, understandably, did not brief this *605 point in view of their having framed the issues as turning, conclusively, on the station versus railroad formulation. In view of the court’s railroad classification, we have no occasion to decide the issue.
Moreover, as discussed with counsel at oral argument, there are other troublesome features involved in MTA’s position. If a municipality is paying for station services, is it to pay again when the services are performed negligently by MTA’s designee, debtor, contractor, or obligor? Secondly, although the settlement figure is not being questioned, should the municipality stand as a surety which must be guarantor of all compensation for the negligence of others — over whose function it has no control whatever? To do so would place the municipality in the position of an insurance carrier whose "insured” MTA acted as its agent in unilaterally settling the case without notifying the principal, let alone seeking permission or consultation to settle. MTA did not even alert the "principal” to the pendency of the litigation or afford it an opportunity to investigate, participate, intervene, or even learn of it until after MTA decided to certify the costs. Reflective of this posture is the MTA Fish/Zullig June 5, 1984 memo, stating that "we should consider identifying any judgment or settlement paid in this matter as station maintenance costs to Dutchess County”. The proposed indemnitor was not notified of this intention until long after the settlement was paid. Because the court concludes that the settlement arose out of a purely railroad function, we need not reach these other issues.
Based on the foregoing, the court is ordered and adjudged that:
(1) The $52,260 charge certified by respondent to Dutchess County for snow removal was properly certified, within Public Authorities Law § 1277.
(2) The $235,369 charge certified by respondent to Dutchess County for settlement of the wrongful death action brought against Conrail were not certifiable, and were improperly charged to Dutchess County.

. The agency was originally created by Laws of 1965 (ch 324) as the Metropolitan Commuter Transportation Authority, its powers described in Laws of 1965 (ch 634). Thereafter, it was to be known as Metropolitan Transportation Authority (MTA) (L 1967, ch 717, §69). To facilitate mass transportation, it was enacted in tandem with the Tri-State Transportation Commission (L 1965, ch 413; see, Governor’s mem, 1965 McKinney’s Session Laws of NY, at 2106; 1967 McKinney’s Session Laws of NY, at 1542). For purposes of State constitutional analysis, the Court of Appeals assumed (City of Rye v Metropolitan Transp. Auth., 24 NY2d 627) that the MTA was actually "created” by the 1967 statute, and held that of the Authority was compatible with NY Constitution, article X, §5, which requires "special” acts of the Legislature in order to create certain public corporations.

. Nassau came in as amicus in Metropolitan Transp. Auth. v City of New York (32 AD2d 197, mod 26 NY2d 817). The court presumably dismissed the contention, sub silentio, but later, in Metropolitan Transp. Auth. v County of Nassau (28 NY2d 385) directly rejected the argument.

. That the maneuver was a railroad operation is clear also from the MTA/Conrail reports which were generated before this litigation. While labels are not controlling, and the court would consider it a purely railroad function regardless of how denominated, we note that the MTA May 11, 1984 memorandum referred to the accident as one involving a yard movement. "It was during this yard movement and while train was being shoved back into another track that the deceased attempted to get off.” A yard is a yard albeit part of a station. The yard is a system of tracks for the making up of trains and such purposes as were conducted at bar (17 NYCRR 924.23 [b]). The defendant’s description made ante litem motam, thus reflects the correct railroad terminology. "Yardmen” and "[y]ard switch tenders” are defined as railroad employees (17 NYCRR 924.15 [a] [42], [48]) as are train dispatchers and directors (17 NYCRR 924.15 [33]). The nature of these operations as uniquely railroad activities is underscored by the extensive reporting required by law, in the case of accidents caused during railroad operations. Reports are mandated for not only injury description and train characteristics (17 NYCRR 924.16-19, but causes 17 NYCRR 924.19 [6]) and requires a statement of the experience of the employee who caused the accident. Obviously, the purpose of this is to monitor actions and responsibilities of rail employees during rail operations.

. MTA settled with the decedent’s estate, but did not raise the possible statutory exemption, by which a railroad is not responsible for actions of trespassers or those who disembark from moving trains. The county argues that according to the reports, the deceased might be considered a "trespasser” who was killed while disembarking from a moving train, during a railroad operation, and that he was not a "station” passenger. Railroad Law *599 § 83 does give railroads some statutory protection against suits by trespassers, and those who alight from moving cars (see generally, Meagher v Long Is. R. R. Co., 27 NY2d 39; Silva v Penn Cent. Transp. Co., 79 AD2d 632; Merriman v Baker, 34 NY2d 330). Section 83 makes it negligence per se to alight a moving train. Thus, either the passenger or the railroad (or possibly both, under comparative negligence) were to blame. The court need not dwell extensively on this point, because, for reasons set forth herein, the train was clearly conducting a purely railroad operation, within the setting of this suit. Whether he was a trespasser or not, the station’s operation, use, or maintenance was unrelated to the accident.

. This statute relates to a voluntary program by which the municipality (New York City) would reimburse the Long Island Railroad (LIRR) for the cost of operating and maintaining certain stations. Nassau and Suffolk Counties were permitted to either reimburse LIRR or operate the stations themselves. Although the MTA was not created until 1965, the precursor statutes are relevant, in terms of intent, usage, and terminology. It is interesting to note that prior to the effective date of Public Authorities Law § 1277, some municipalities contracted with the LIRR pursuant to Laws of 1961 (ch 201) wherein the counties were to pay the railroad for station costs. In the contracts, the railroad agreed to hold the counties harmless for any negligent acts of railroad employees (If 7). (Emphasis added.)

. In seeking to sustain the cost certification, MTA itself refers to the accident as an item of station "maintenance”. In its answer, MTA expressly ascribes the cost to station "maintenance”; and in its Zullig affidavit the cost is also argued as one for station "maintenance”.
That the word "use” was never intended to broaden the municipality’s liability is evident not only from the rejection of the MTA’s argument in 1969 (Metropolitan Transp. Auth. v City of New York, 32 AD2d 197, mod 26 NY2d 817), but from the legislative history in connection with the three words, beginning with the 1965 report of Dr. Ronan’s Special Committee to Governor Rockefeller. The history, as we have seen, supports MTA’s argument concerning snow removal costs but cannot be extended to encompass this railroad operations accident.

. County Law former § 850 was supplanted by General Municipal Law § 98 (L 1963, ch 606). The pertinent language of Laws of 1961 (ch 201, § 2) was carried over into General Municipal Law § 98 (2) (c).

. It is interesting to observe that General City Law § 21-c differed from County Law former § 850 in two ways. The differences are slight, in the over-all concept, but instructive, nonetheless. The County Law statute, unlike the General City Law, gave counties the option to operate stations themselves. Further, the County Law statute contained a provision (former § 850 [1] [c]) which defined the railroad’s responsibilities. The provision was obviously designed to avoid any problems with overlapping jurisdiction between the railroad and the counties. Thus, with legislatively demarcated lines of responsibility, the surface similarities between railroad operations and station activities become readily distinguishable. If a county elected to maintain its own station, it could not be made responsible for railroad operations (County Law former § 850 [1] [c], now General Municipal Law § 98 [1] [c]), and if there is a contract, the railroad "shall continue responsible” for railroad operation (emphasis added). It is illogical to conclude, therefore, that by absorbing station costs under Public Authorities Law § 1277 — which contains the same definition of passenger "station” as the County Law and Municipal Law — the county somehow becomes responsible for operating trains, conducting switching and interlocking movements, or deciding when a train should be put into reverse. Indeed, the line is so clearly drawn that the Legislature forbids contractual attempts at distorting it (County Law former § 850 [1] [e], now General Municipal Law § 98 [1] [e]).

. The same agreed statement was presented to the Court of Appeals.

. Switching, train direction and interlocking procedures, being uniquely railroad operations, are subject to State regulations under the Railroad Law, and had appeared under the heading Construction, Operation, and Management of Railroads (art 3).
By law, switching operations formerly required a "crew” of at least one engineer, a fireman, a conductor, and two trainmen or helpers, the very crew which undertook the switching movement in the matter before us. That it falls within the realm of railroad operations is evident from its presence under Railroad Law former § 54-C, and the recognition that switching regulations were enacted to promote safety in railroad operations. The "full crew” laws had been in existence since 1937 and were upheld as constitutional (New York Cent. R. R. Co. v Lefkowitz, 23 NY2d 1, appeal dismissed 393 US 536) until repeal (L 1966, ch 693) based, undoubtedly in part, on the recommendation of the Public Service Commission dated January 26,1960. But the report, which recommended repeal, did nothing to alter the conclusion that switching procedures are, emphatically, railroad operations. Indeed, the reasons for repeal were embodied within the PSC report, which suggested that the "full crew” laws were featherbedding measures to insure that certain employees continue in their railroad operations. At present, so far as switching is concerned, it is no less than ever strictly a railroad function, and the Commissioner of Transportation, in the interests of public safety, is authorized to require switches in certain instances (Railroad Law § 56). The Legislature has required railroad personnel to inspect switches, on foot, at least once a month (Railroad Law § 69 [4]) and to maintain them in safe condition (Railroad Law § 69 [8], [11]). These are responsibilities which the Legislature has placed on the railroads (§ 69).

. The statute is part of chapter 16, Regional Rail Reorganization (45 USC §§ 701-797). Pursuant to 45 USC § 744 (a) "notwithstanding any other provision of law or contract, Conrail shall be relieved of any legal obligation to operate commuter service on January 1, 1983.” Pursuant to Pub L 97-35 § 1139 (b), as amended by Pub L 97-468, title V, § 504 (a), January 14, 1983 (96 Stat 2552), the United States Government authorized to be appropriated to the Secretary of Transportation (45 USC § 702 [18]), an amount of up to $50,000,000 to facilitate the transfer of rail commuter services from Conrail to other operators. The distribution of funds was to take into account any "adverse financial impact upon any commuter authority” resulting from Conrail’s demise. It is in this setting MTA seeks to exact from petitioner reimbursement for expenses which MTA paid, owing to Conrail’s negligence. Because this is ancillary, the parties have not discussed the Federal allotment and whether MTA partook of any of it. Even assuming that MTA did *605 not, it is evident that in superintending Conrail’s extinction the Congress did not intend to somehow impose Conrail’s negligence debts upon a municipality which had nothing to do with the way Conrail operated or directed its trains.